**ASSOCIATION OF CIVILIAN TECHNICIANS, MONTANA AIR CHAPTER, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

No. 83-1489.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 24, 1985.

Decided March 8, 1985.

Daniel M. Schember, Washington, D.C., with whom D. Patrick McKittrick and Phillip R. Kete, Washington, D.C., were on brief, for petitioner.

Robert J. Englehart, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Ruth E. Peters, Sol., and Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent. William E. Persina, Washington, D.C., entered an appearance for Federal Labor Relations Authority.

Clinton D. Wolcott and Bruce P. Heppen, Washington, D.C., were on the brief for amicus curiae, National Federation of Federal Employees, urging reversal.

James E. Mundy, was on the brief for amicus curiae, American Federation of State, County and Municipal Employees, Council 26, urging reversal.

Before ROBINSON, Chief Judge, and WRIGHT and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

**HARRY T. EDWARDS, Circuit Judge:**

This case presents several issues relating to the scope of an agency's duty to bargain under the Federal Service Labor-Management Relations Statute ("the Statute").[1] The petitioner, the Association of Civilian Technicians, Montana Air Chapter ("the Union"), is the exclusive representative of civilian technicians employed by the Montana Air National Guard ("the Guard"). Under the National Guard Technicians Act of 1968 ("the Technicians Act"),[2] civilian technicians have a dual status: they are federal employees, who are entitled to corresponding retirement and fringe benefits; they also are required to retain membership in a state National Guard, under the direct supervision of an adjutant general. As federal employees, the technicians have the right to engage in collective bargaining under the Statute.

During the course of negotiations for a new collective bargaining agreement, the Guard alleged that nine Union proposals concerning the rights of employees affected by a reduction in force ("RIF") were outside the Guard's duty to bargain under the Statute. The Union appealed to the Federal Labor Relations Authority ("the FLRA" or "the Authority"), which ruled in favor of the Guard.[3] The Union then brought this petition for review under 5 U.S.C. § 7123.

The Authority's rulings with respect to five of the Union's proposals are before us at this time.[4] Proposals 4, 5 and 8 seek to require that reductions in force be conducted on the basis of seniority. We affirm the Authority's holding that these proposals are nonnegotiable under section 7117(a)(2)

1. 5 U.S.C. §§ 7101–7135 (1982). The Statute was enacted as title VII of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, 1191 (1978).

2. 32 U.S.C. § 709 (1982).

3. 11 F.L.R.A. 505 (1983).

4. This court previously granted the Union's motion for summary reversal of the FLRA's decision with respect to Proposals 3 and 6, under which employees who are adversely affected by a RIF would be accorded priority in filling new vacancies. *Association of Civilian Technicians, Montana Air Chapter v. FLRA,* No. 83–1489 (Aug. 1, 1983) (granting motion for partial summary reversal). The court found summary reversal on this issue appropriate in light of the decision in *American Fed'n of Gov't Employees, Local 2782 v. FLRA,* 702 F.2d 1183 (D.C.Cir. 1983). The Authority's decision on Proposals 2 and 7 is not challenged in this case. *See* Brief for Petitioner at 3 n. 2.

of the Statute because they conflict with a National Guard regulation for which there is a "compelling need." However, we reverse the Authority's holding that Proposal 1, which seeks to require the Guard to impose a temporary hiring freeze while a RIF is being carried out, is negotiable only at the election of the agency under section 7106(b)(1) of the Statute. Finally, we find that the Authority failed to properly consider Proposal 9 when it held this Union demand to be inconsistent with the Technicians Act. Proposal 9 would require the Guard to automatically renew a technician's military grade and enlistment except for "just cause." We remand for further proceedings with respect to Proposals 1 and 9.

### I. THE SENIORITY RIGHTS PROPOSALS

█ Union Proposals 4, 5 and 8 are designed to ensure that the retention and placement of employees during a RIF be determined by seniority. Under Proposal 4, "[r]eduction in force will be by seniority as listed on tenure lists of competitive areas."[5] Proposal 5 would establish a system of displacement rights, under which an employee potentially affected by a RIF would be permitted to assume the position of an employee with less seniority, so long as the senior employee either was qualified or could be retrained for the new position.[6] Proposal 8 similarly would allow certain technicians who had been promoted out of the bargaining unit to "bump" back into it if their present positions were eliminated during a RIF.[7]

The Authority held each of these three proposals non-negotiable under section 7117(a)(2) of the Statute, which provides that the duty to bargain extends to matters that are the subject of any agency rule or regulation "only if the Authority has determined ... that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation."[8] The FLRA found Proposals 4, 5 and 8 inconsistent with a National Guard Bureau regulation, Technician Personnel Manual chapter 351 ("TPM 351"), which provides that employee retention during a RIF is to be determined not by seniority but by combined military and civilian performance evaluation scores. Applying its standards for determining compelling need, which are codified at 5 C.F.R. § 2424.11,[9] the Authority held that TPM 351 serves a compelling need under section 2424.11(c) because it "implement[s] in an essentially nondiscriminatory manner the statutory mandate [of sections 709(b) and (e)(1) of the Technicians Act] that technicians maintain

---

5. *See* 11 F.L.R.A. at 508.

6. *See id.* at 509–10.

7. *See id.* at 512.

8. 5 U.S.C. § 7117(a)(2) (1982) provides as follows:

  The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation. *Id.* An exception to this rule is created by § 7117(a)(3), which states that the rule does not apply in cases where "an exclusive representative represents an appropriate unit including not less than a majority of the employees in the issuing agency or primary national subdivision, as the case may be, to whom the rule or regulation is applicable." 5 U.S.C. § 7117(a)(3) (1982).

9. 5 C.F.R. § 2424.11 (1983) provides:

  A compelling need exists for an agency rule or regulation concerning any condition of employment when the agency demonstrates that the rule or regulation meets one or more of the following illustrative criteria:

  (a) The rule or regulation is essential, as distinguished from helpful or desirable, to the accomplishment of the mission or the execution of functions of the agency or primary national subdivision in a manner which is consistent with the requirements of an effective and efficient government.

  (b) The rule or regulation is necessary to insure the maintenance of basic merit principles.

  (c) The rule or regulation implements a mandate to the agency or primary national subdivision under law or other outside authority, which implementation is essentially nondiscretionary in nature.

military membership in the National Guard and hold the military grade specified for their technician positions."[10] On this basis, the Authority concluded that Proposals 4, 5 and 8 were outside the statutory duty to bargain.[11]

As the Union concedes, a panel of this court "affirmed an identical Authority finding as to the same regulation"[12] last year in *American Federation of Government Employees, Local 2953 v. FLRA*.[13] *Local 2953* held that, in light of the unique provisions of the Technicians Act assigning the technicians a dual civilian and military function, TPM 351 implemented the mandate of that Act in an essentially nondiscretionary manner by requiring that the technicians' military performance be taken into account in determining employee retention during a RIF.

The petitioner and the amici urge us to overrule *Local 2953*, maintaining that the decision misconstrues the mandate of the Technicians Act and improperly expands section 2424.11(c)'s exception to the statutory duty to bargain. However, as the Union recognizes,[14] we are bound by the principle of *stare decisis* to "abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court *en banc* has overruled it."[15] This principle would be undermined if previous decisions were open to reconsideration merely because they were debatable. We find no convincing grounds for reconsidering *Local 2953* here, and accordingly find that decision controlling.

In an effort to avoid this result, the Union challenges the constitutionality of section 7117's "compelling need" provision. As previously noted, although section 7117(a)(2) provides that the statutory duty to bargain ordinarily does not extend to matters that are the subject of an agency regulation for which the FLRA determines there is a "compelling need," section 7117(a)(3) provides that such matters are negotiable if "an exclusive representative represents an appropriate unit including not less than a majority of the employees in the issuing agency ... to whom the ... regulation is applicable."[16] The Union contends that, by according "large" labor organizations certain bargaining rights that are denied smaller organizations, the statute infringes the First Amendment right to freedom of association. Alternatively, the Union contends that the statutory classification lacks a rational relationship to the purpose of the "compelling need" restriction, and thus violates the equal protection principle implicit in the Fifth Amendment. We find these arguments without merit.

■ First, we reject the Union's argument that the provisions of section 7117 violate the First Amendment. While the First Amendment guarantees the rights of public employees to speak freely and to associate with others, and "protects the right of associations to engage in advocacy on behalf of their members," it imposes no "affirmative obligation on the government ... to recognize [such an] association and bargain with it."[17] Because the govern-

**10.** 11 F.L.R.A. at 508. This holding followed the Authority's decision in *Association of Civilian Technicians, Pennsylvania State Council and The Adjutant General, Dep't of Military Affairs, Commonwealth of Pennsylvania*, 3 F.L.R.A. 50, 54 (1980) (*"Pennsylvania State Council"*).

**11.** 11 F.L.R.A. at 508–10, 512.

**12.** Brief for Petitioner at 6.

**13.** 730 F.2d 1534 (D.C.Cir.1984).

**14.** Prior to the panel hearing in this case, the Union requested an initial hearing *en banc* on the ground that the present panel would be bound by *Local 2953. See* Petitioner's Sugges-

tion for Hearing En Banc at 1. The request was denied by the full court on October 9, 1984. *Association of Civilian Technicians, Montana Air Chapter v. FLRA*, No. 83–1489 (D.C.Cir. Oct. 9, 1984) (denying suggestion for initial hearing *en banc*).

**15.** *Brewster v. Commissioner*, 607 F.2d 1369, 1373 (D.C.Cir.) (per curiam), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

**16.** 5 U.S.C. § 7117(a)(3) (1982).

**17.** *Smith v. Arkansas Highway Employees, Local 1315*, 441 U.S. 463, 464–65, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360 (1979) (per curiam) (footnote omitted).

ment is under no constitutional duty to bargain collectively with labor organizations, it retains the authority to provide that such bargaining shall be limited to a particular class of subjects. Congress exercised this authority in section 7117(a)(2) when it provided that agency regulations for which a compelling need exists would generally be outside the scope of collective bargaining.

The Union contends, however, that by making an exception to this rule for the organizations described in section 7117(a)(3), the statutory scheme "grant[s] large associations legal rights denied small associations," thereby violating the freedom of association.[18] We believe this argument to be flawed in several respects. First, we disagree with the petitioner's view that section 7117 favors "large and powerful" unions over "small and weak" unions.[19] Section 7117(a)(3) confers broader negotiating rights not simply on the basis of the size of the bargaining unit, but rather on the basis of the size of the bargaining unit in relation to the number of agency employees to whom a particular regulation applies. Thus, to use an example given by the FLRA, subsection (a)(3) would grant the broader bargaining rights to a bargaining unit of 101 employees in a 200-employee agency, but not to a bargaining unit of 50,000 employees in a 101,000-employee agency.[20] Nor is there any necessary correspondence between the size of a bargaining unit and the size of any national union that represents the employees in that unit.

Furthermore, the petitioner's argument that section 7117(a)(3) burdens the right of its members to belong to a small rather than a large bargaining unit appears to assume that, under the Statute, employees have a right to determine the size of the bargaining units to which they will belong.[21] Under section 7112,[22] however, the authority to determine appropriate units of bargaining lies with the FLRA, not with the employees affected. The petitioner does not suggest that this provision abridges its members' freedom of association, and there can be little doubt that the provision is within Congress' power to regulate labor-management relations in the federal sector. It follows that section 7117(a)(3)'s partial reliance on the size of units of bargaining as determined by the FLRA does not impair employees' freedom of association.

Finally, to the extent that section 7117(a)(3) arguably favors large unions over small ones, we nevertheless find the provision constitutional. Since, as we have observed, there is no constitutional right to bargain collectively with the federal government, Congress may make reasonable distinctions in the scope of the bargaining rights that it grants. As we explain below in considering the petitioner's equal protection challenge, we find that the classification contained in section 7117(a)(3) is reasonable.

■■■ Under the "lenient standard" that the courts have traditionally applied in reviewing social and economic legislation, a statute that neither burdens fundamental rights nor employs suspect criteria will be upheld against an equal protection challenge "if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose."[23] Moreover, such legislation is accorded "a presumption of rationality that

**18.** Brief for Petitioner at 14. We note that the Union makes no claim that the provisions of section 7117 violate freedom of speech by granting narrower rights of expression on the basis of content or speaker identity. *Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

**19.** Brief for Petitioner at 13.

**20.** *See* Brief for FLRA at 15.

**21.** *See* Brief for Petitioner at 11–15.

**22.** 5 U.S.C. § 7112 (1982).

**23.** *Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983).

can only be overcome by a clear showing of arbitrariness and irrationality." [24]

■ We think that, under a rational basis analysis, the framework of bargaining rights contained in section 7117 is clearly constitutional. As the legislative history reveals, that framework represents a compromise reached in the House of Representatives between two competing standards—the approach adopted by the Senate, which would have followed the existing law in barring negotiation over agency regulations supported by a "compelling need," [25] and the more expansive approach proposed by the House Committee on Post Office and Civil Service, which would have permitted negotiation over all agency regulations. [26] The compromise, which originated in the substitute amendment proposed by Congressman Udall [27] and which was ultimately accepted by both houses, allowed negotiation over agency regulations supported by a "compelling need" only where a union represents at least a majority of agency employees affected by such regulations. Although the legislative history contains no specific explanation for Congress' choice to draw the line where it did, we cannot say that its decision was an irrational one. [28] Congress could reasonably have believed that the framework

adopted in section 7117 offered the most workable accommodation between the objectives of promoting collective bargaining and preserving management authority in certain important areas. Moreover, as the FLRA maintains, section 7117 operates to ensure that regulations supported by a compelling need are not subject to piecemeal negotiation with numerous bargaining units throughout the agency, but are negotiable only at a level that would affect a majority of the agency employees involved. [29] Because the petitioner has failed to demonstrate that section 7117 is unsupported by a rational basis, we hold that that provision is not invalid under the equal protection principle implicit in the Fifth Amendment.

## II. THE HIRING FREEZE PROPOSAL

Proposal 1 would require the Guard to impose a temporary freeze on hiring from outside sources until a RIF is completed. [30] The Authority held Proposal 1 nonnegotiable on the ground that it would interfere with management rights under 5 U.S.C. § 7106, which provides as follows:

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

24. *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981).

25. *See* S. 2640, 95th Cong., 2d Sess. § 7215(c) (1978), U.S.Code Cong. & Admin.News 1978, p. 2723, *reprinted in* SUBCOMMITTEE ON POSTAL PERSONNEL & MODERNIZATION, HOUSE COMM. ON POST OFFICE & CIVIL SERV., 96TH CONG., 1ST SESS., LEGISLATIVE HISTORY OF THE FEDERAL SERVICE LABOR-MANAGEMENT RELATIONS STATUTE, TITLE VII OF THE CIVIL SERVICE REFORM ACT OF 1978, at 550, 578 (1979) ("LEGISLATIVE HISTORY"); for the pre-1978 approach, see Exec. Order No. 11,838, 3 C.F.R. 957, 959 (1971–75 Comp.) (amending Exec. Order No. 11,491, § 11(a), 3 C.F.R. 861, 868 (1966–70 Comp.)), *reprinted in* LEGISLATIVE HISTORY at 1336–38.

26. *See* H.R. 11,280, 95th Cong., 2d Sess. § 7117(a) (1978), *reprinted in* LEGISLATIVE HISTORY at 372, 409. The House committee bill would have barred negotiation only over *government-wide* regulations for which a compelling need existed.

27. *See* 124 CONG.REC. 29,178 (1978), *reprinted in* LEGISLATIVE HISTORY at 915–16.

28. *See, e.g., Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981) (The rational basis standard " 'reflect[s] the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one.' ") (quoting *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam)); *see also United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) ("The task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line,' and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.") (quoting *Mathews v. Diaz,* 426 U.S. 67, 83–84, 96 S.Ct. 1883, 1893–1894, 48 L.Ed.2d 478 (1976)).

29. Brief for FLRA at 22.

30. *See* 11 F.L.R.A. at 505.

(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from—

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

In the instant case, the FLRA followed its *Alexandria* decision in which it held a proposal for a temporary hiring freeze "negotiable only at the election of the Agency since it was directly and integrally related to the statutory right of management to determine numbers and types of employees under section 7106(b)(1) of the Statute." [31] In *Alexandria*, the Authority concluded that such a freeze would preclude the agency "from hiring new employees of the requisite types, at the requisite grades, and in the necessary numbers to meet changes in mission requirements." [32] Rejecting the argument that such a freeze was negotiable under subsections (b)(2) and (b)(3) of section 7106, which require negotiation over the procedures management must follow in exercising its authority and over appropriate arrangements for employees adversely affected by the exercise of that authority, the FLRA in *Alexandria* reasoned that a freeze proposal would prescribe procedures or arrangements only "by requiring the agency to bargain on matters which, under the Statute, it has a right to elect not to bargain." [33]

The Authority's conclusion that section 7106 requires bargaining in these circumstances only at the election of the agency is clearly incorrect. That section reflects the basic principle—carried over from the pre-1978 administrative law governing federal labor relations—that although management has a right to make the substantive decisions with respect to certain subjects, it is nonetheless required to negotiate both over procedures for implementing such decisions and over arrangements for employees adversely affected by such decisions. [34] As our precedents make clear, this obligation to bargain over the "impact and implementation" of agency decisions extends to proposed procedures or arrangements that would to some extent interfere with the exercise of management rights under section 7106(a). Thus, in *Department of Defense, Army-Air Force Exchange Service*

**31.** 11 F.L.R.A. at 505–06 (footnote omitted); *see National Fed'n of Fed. Employees (NFFE), Local 1332 and Headquarters, U.S. Army Material Dev. & Readiness Command, Alexandria, Virginia,* 3 F.L.R.A. 611 (1980) ("*Alexandria*").

**32.** 3 F.L.R.A. at 613.

**33.** *Id.*

**34.** *See* H. Robinson, Negotiability in the Federal Sector 29–31 (1981).

*v. FLRA*,[35] we upheld the Authority's view that proposed procedures are negotiable under section 7106(b)(2) even though, if adopted, they would delay management's power to act under section 7106(a), so long as they would not prevent the agency from "acting at all." [36] Moreover, under our decision in *American Federation of Government Employees, Local 2782 v. FLRA*,[37] proposals to make "appropriate arrangements" for employees adversely affected by a RIF are negotiable under subsection (b)(3) even if they would directly interfere with the exercise of management's authority under subsection (a).

■ The fact that the Authority held in the present case that the Union's proposal would affect the exercise of management rights under subsection (b)(1)—as distinct from subsection (a), the provision at issue in *Department of Defense and Local 2782* —provides no basis for a different result. First, the language of subsections (b)(2) and (b)(3) expressly requires negotiation over procedures and arrangements in connection with the exercise of *"any* authority under this section." [38] Second, it would be anomalous to construe section 7106 to require bargaining over impact and implementation with respect to the matters contained in subsection (a)—matters whose substances the agency may not negotiate under any circumstances—but not with respect to the subjects listed in subsection (b)(1)—subjects over which the agency is permitted to bargain if it chooses. Therefore, we hold that, under sections 7106(b)(2) and (b)(3), an agency is required to bargain over "procedures" and "arrangements" with respect to the exercise of any of the management rights enumerated in section

7106, whether contained in subsection (a) or in subsection (b)(1).

■ Thus, the Authority erred in holding Proposal 1 "nonnegotiable simply because the proposal envisions some constraints upon rights generally reserved (in other contexts) to management." [39] Accordingly, we reverse the Authority's ruling that Proposal 1 is nonnegotiable and remand for such further proceedings as may be appropriate.

### III. THE REENLISTMENT RIGHTS PROPOSAL

■ Finally, we hold that the Authority failed to properly consider the Union's proposal regarding technicians' reenlistment rights in the Guard, and we therefore remand to the Authority for reconsideration on this issue.

Union Proposal 9 provides that "all job related requirements affecting a technician in his technician employment are automatically renewable unless the technician is separated for physical requirements or for just cause." [40] The Authority interpreted this proposal to preclude separation of a technician for failure to maintain military membership in the Guard or to hold the military grade specified for his position, and thus held the proposal inconsistent with section 709(e)(1) of the Technicians Act, which mandates separation in such circumstances.[41]

As both the Union and the Guard recognized in their submissions to the Authority, however, Proposal 9 is not intended to prohibit the discharge of technicians who fail to maintain military grade or membership, but rather to prevent the Guard from denying such job related requirements without just cause.[42] In other words, the purpose

**35.** 659 F.2d 1140 (D.C.Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

**36.** *Id.* at 1152–58.

**37.** 702 F.2d 1183 (D.C.Cir.1983).

**38.** 5 U.S.C. § 7106(b)(2), (3) (1982) (emphasis added).

**39.** *Local 2782,* 702 F.2d at 1188.

**40.** 11 F.L.R.A. at 512.

**41.** *Id.* at 512–13.

**42.** *See* Letter from Bernard W. Hurlock, Deputy Chief, Office of Technician Personnel, to James J. Shepard, Executive Director, FLRA (Jan. 23, 1981), Record Document No. 4, at 4–5 (stating Guard's position on negotiability of Proposal 9); Letter from Thomas G. Bastas, President, Montana Air Chapter, to James J. Shepard (Feb. 9,

of Proposal 9 is to prevent involuntary retirement of civilian technicians through unjustified refusal to renew the military requisites of their employment.

In its statement of position before the FLRA, the Guard argued that Proposal 9 would require negotiation over the terms and conditions of the military relationship, and that this subject was beyond the Guard's duty and authority to bargain both under FLRA precedent [43] and under a federal statute prohibiting union organization of the armed forces.[44] The Union denied that its proposal required negotiation over the terms and conditions of military service, and contended that the legislative history of the Technicians Act showed that Congress anticipated that the National Guard would continue to grant technicians automatic reenlistment until the age of 60, in accord with the National Guard's policy at the time.[45]

In ruling on Proposal 9, however, the Authority failed even to consider the relevant issues. Instead, it held the Union's proposal nonnegotiable on the basis of a total misinterpretation of the proposal to require automatic renewal of a technician's *civilian employment,* rather than of the *military requirements* for such employment. Because the Authority's decision on this issue relied on erroneous grounds and failed to consider the relevant issues, we remand for reconsideration with respect to this question.[46]

### Conclusion

The FLRA's decision that Proposals 4, 5 and 8 are nonnegotiable is affirmed. However, its holdings with respect to the negotiability of Proposals 1 and 9 are reversed, and the case is remanded with respect to these issues for such further proceedings as may be appropriate and consistent with this opinion.

*So ordered.*

1981), Record Document No. 5, at 7–8 (Union's response).

**43.** *See Pennsylvania State Council,* 3 F.L.R.A. at 54–55.

**44.** *See* 10 U.S.C. § 976 (1982).

**45.** *See* S.Rep. No. 1446, 90th Cong., 2d Sess. 12 (1968).

**46.** We intimate no view on how the question should be decided on remand.