NUCLEAR REGULATORY COMMIS-
SION, Petitioner–Appellant,

v.

FEDERAL LABOR RELATIONS AU-
THORITY, Respondent–Appellee,

National Treasury Employees
Union, Intervenor.

No. 88–2086.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1989.

Decided Feb. 2, 1990.

Dennis Craig Dambly, Deputy Asst. Gen. Counsel Washington, D.C., for Admin. (William H. Briggs, Jr., Sol., E. Leo Slaggie, Deputy Sol., James E. Cradock, Sr. Atty., Washington, D.C., Office of the General Counsel, U.S. Nuclear Regulatory Com'n, on brief) for petitioner–appellant.

Jill Ann Griffin (William E. Persina, Acting Sol., Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, on brief), Clinton Wolcott, Washington, D.C., for respondent-appellee.

Gregory O'Duden, Director of Litigation, Washington, D.C., Elaine Kaplan, Deputy Director of Litigation, Michele L. Rusen, Asst. Counsel, National Treasury Employees Union, on brief) for intervenor.

Before RUSSELL and MURNAGHAN, Circuit Judges, and STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation.

MURNAGHAN, Circuit Judge:

This case presents a federal government labor dispute which has at its core a few simple issues. The National Treasury Employees Union ("Union") has presented several collective bargaining proposals to the Nuclear Regulatory Commission ("NRC"). The NRC has refused to negotiate, stating that by statute the subject matter of the proposals is within its exclusive purview as a government agency. The Federal Labor Relations Authority (FLRA) disagreed and ordered the NRC to bargain. The NRC appeals the order to this Court, and the FLRA applies for enforcement.

To enforce the FLRA's order, we must determine whether the three proposals at issue—one asking for a freeze on personnel promotions and transfers in the event of a reduction in force (RIF) of the government employees, the other two granting union members the right, in the event of a RIF, to displace junior employees or revert to a lower pay grade position if available ("bump and retreat")—interfere excessive-

ly with the NRC's exclusive statutory mandate and, if so, whether they are nevertheless negotiable under the applicable statutes as an "arrangement" for employees adversely affected by the proper exercise of a government agency's powers, in this case a unilateral reduction of the agency work force.

I.

The subject proposals were among many presented during the course of collective bargaining negotiations between the NRC and the Union, which generally represents all nonsupervisory NRC employees. The proposals provided in pertinent part:

XI. *Proposal 38.12*

After a RIF has been directed or approved by higher authority and until the RIF is consummated or cancelled, reassignments and competitive promotions within the bargaining unit will be frozen.[1]

XV. *Proposals 38.20 and 38.21*

*Proposal 38.20*

A. When the Employer abolishes all positions in a competitive area within 3 months, it shall release employees in subgroup order. Within a subgroup, release shall solely be based upon length of federal service. Ties shall be broken as provided for in Section 19.

B. For all actions under this Article bump and retreat rights shall be provided for employees in each group and subgroup including group III.

C. Where an employee retreats or is bumped to a lower graded position and his/her position becomes vacant, the employee upon request shall be repromoted to his/her position.

*Proposal 38.21*

A. An employee is entitled to an offer of a position commensurate with his/her assignment rights as stated in RPM Chapter 351. An employee is entitled to no further offer of assignment when:

1. he/she accepts or rejects an offer, or

2. he/she fails to reply to an offer within the stated time limit.

B. Upon receiving a specific RIF notice containing the best available offer of an assignment, the employee will be given 15 working days to accept or decline the assignment offer.

C. In rejecting an offer, an employee may indicate second and third choices of alternate position for which he/she is otherwise qualified.

D. The Employer agrees to waive qualification standards in determining placement opportunities as provided for in applicable laws and regulations to maximum extent feasible and in fair and equitable manner.

E. When an employee has been involuntarily reassigned to a position of equal grade without personal cause in a RIF, he/she will be selected to fill his/her prior position which becomes vacant again. If there is more than one employee eligible for the position, selection shall be made according to the employee with the longest federal service.

F. 1. The sex of an employee may not be considered in determining whether an employee is qualified for a position.

2. An employee who is released from a competitive level during a leave of absence because of a compensable injury may not be denied an assignment right solely because the employee is not physically qualified for the duties of the position if the physical disqualification resulted from the compensable injury.

G. No employee who is other than full-time may be involuntarily assigned to a full-time or vice-versa.

The NRC asserted that the above proposals were nonnegotiable, and the Union subsequently filed a petition for review of the negotiability of its proposals with the FLRA. On February 23, 1988, the FLRA held the proposals at issue were negotiable and ordered the NRC to bargain. The NRC sought review of the order, and the

---

1. In this instance, the entire NRC constitutes a "bargaining unit."

FLRA sought enforcement, pursuant to 5 U.S.C. § 7123(a) and (b).

In *U.S. Dept. of Health & Human Services v. FLRA*, 844 F.2d 1087 (4th Cir.1988) (*en banc*), we discussed at length the collective bargaining system for federal employees contained within Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7101–7135 (1982 and Supp. VI 1986). In brief, the federal labor-management relations statute imposes on federal agencies a "broadly defined" and "expansive" duty to bargain that is "subject only" to express statutory exceptions. *Library of Congress v. FLRA*, 699 F.2d 1280, 1285 (D.C.Cir. 1983). While employees in the federal sector have the right "to engage in collective bargaining with respect to conditions of employment," 5 U.S.C. § 7102(2), those "conditions" are defined to exclude "personnel policies, practices and matters ... (C) to the extent such matters are specifically provided for by Federal statute." 5 U.S.C. § 7103(a)(14). Moreover, a federal agency's general duty to bargain in good faith exists only "to the extent not inconsistent with any Federal law or any Government-wide rule or regulation....," 5 U.S.C. § 7117(a)(1), and agencies are specifically prohibited from negotiating on certain matters contained in the "management rights" clause of 5 U.S.C. § 7106(a). *E.g., AFGE v. FLRA*, 778 F.2d 850, 851–53 (D.C. Cir.1985); *Ass'n of Civilian Technicians Montana Air Charter v. FLRA*, 756 F.2d 172, 180 (D.C.Cir.1985). These rights include, *inter alia*, the right "to determine the mission, budget, organization, number of employees and internal security practices of the agency...." 5 U.S.C. § 7106(a). However, the statute further provides that the Union may negotiate "procedures which management officials will observe" in exercising any of its § 7106 rights and "appropriate arrangements for employees adversely affected" by the exercise of any

of these rights. 5 U.S.C. § 7106(b)(2), § 7106(b)(3). *See AFGE v. FLRA*, 819 F.2d 306, 308–09 (D.C.Cir.1987).

Negotiability is an important trait, as collective bargaining in the federal sector includes provisions for binding resolution of disputes in the event bargaining is unsuccessful. 5 U.S.C. § 7119(b), (c)(5)(B) & (C). Disputes over the negotiability of collective bargaining proposals may be referred to the FLRA, with final review by the appropriate federal court of appeals. Due deference is paid to an FLRA determination of negotiability. An FLRA decision will be set aside only if a review of the record demonstrates an action, finding, or conclusion is "arbitrary, capricious, or abuse of discretion or otherwise not in accordance with the law," 5 U.S.C. §§ 7123(c) and 706(2)(A).

## II.

■ We first consider the Union's proposal to freeze bargaining unit reassignments and competitive promotions in the event of a RIF. Although the FLRA found the Union's freeze proposal to be negotiable, the FLRA members deciding the matter disagreed as to the proper basis for decision, issuing separate opinions. Chairman Calhoun found that, although the proposal "would directly interfere with management's right, under section 7106(a)(2)(C) of the statute, to fill positions by making selections from among properly ranked and certified candidates for promotion and any other appropriate source," [2] the proposal was permissible as an appropriate arrangement for adversely affected employees. Member McKee, on the other hand, found that the proposal was a negotiable procedure which did not directly interfere with management's rights, as the NRC was free to hire personnel from outside the agency to fill any vacancies.[3] *See*

---

**2.** The statute provides, in pertinent part, that:

   (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

    (2) in accordance with applicable laws—

   (C) with respect to filling positions, to make selections for appointments from—

    (i) among properly ranked and certified candidates for promotion; or

    (ii) any other appropriate source.

5 U.S.C. § 7106(a)(2).

**3.** Both members relied on their analysis of a

*NTEU and Department of Energy,* 24 FLRA 479 (1986).

We examine the proposal under the Chairman's approach, which involves a lesser degree of scrutiny.[4] The FLRA determines whether a proposed "arrangement" is "appropriate" for bargaining by applying the "excessive interference" test. The competing practical needs of employees and managers are weighed in the light of various factors, so as to determine whether, on balance, the impact of the proposal on management's rights is excessive when compared to the benefits afforded employees. *National Association of Government Employees, Local R14–87 and Kansas Army National Guard,* 21 FLRA 24, 32 (1986).[5] The determination of an appropriate arrangement in such cases is found by examining the nature and extent of the impact experienced by the adversely affected employees; the extent to which the circumstances giving rise to the adverse effects are within the employee's control; the impact on management's ability to deliberate and act pursuant to its statutory rights—especially whether the negative impact on an agency's rights is disproportionate to the benefit to employees from the arrangement; and the effect of the proposed arrangement upon effective and efficient government operations. *Congressional Research Employees Association and Library of Congress, Congressional Research Service,* 25 FLRA 306, 309–310 (1987). As the NRC could fill vacant positions by outside hires, Chairman Calhoun observed that the proposal, which "applied only to positions filled through reassignments and promotions within the bargaining unit," "placed an insubstantial burden on management when compared to the potential benefit on affected employees and was[,] therefore, negotiable as an appropriate arrangement."[6]

We, however, disagree. The Union freeze proposal clearly contravenes the rights reserved to federal agencies under the management rights clause of § 7106 as an "appropriate arrangement." There is little doubt that restricting the pool of available personnel to fill agency positions (particularly when that restriction may eliminate the most qualified applicants—experienced employees) is a direct interference with the NRC's exclusive right to select and determine the personnel by which agency operations should be conducted. 5 U.S.C. § 7106(a)(1), (a)(2)(A) & (B).

similar bargaining proposal in *NTEU v. HHS, Region X,* 25 FLRA 1041, 1058 (1987). There, however, the proposal provided that during a RIF "reassignments and competitive promotions within the bargaining unit *will be restricted to those actions the employer considers necessary for the essential functioning of the organization.*" 25 FLRA at 1055 (emphasis supplied).

The NRC argues that the proposal should be interpreted as barring *any* outside hires, as well as competitive promotions or reassignments of current employees. The NRC also alleges that this was the standard union interpretation of the proposal during bargaining, changed only now for purposes of litigation. Such an interpretation may indeed place the NRC at a serious disadvantage. The plain language of the proposal, however, does not support the NRC's position; there is no mention of outside hires. Accordingly, we analyze the proposal in the light adopted by the FLRA—notwithstanding this proposal, any vacancies during a RIF may be filled by outside hires.

4. Member McKee's finding of no interference necessarily subsumes a finding that, if treated as an "arrangement," the proposal would not *excessively* interfere. *See supra.*

5. The Authority's "excessive interference" test set forth in *Kansas Army National Guard* was adopted from the D.C.Circuit's decision in *AFGE, Local 2782 v. FLRA,* 702 F.2d 1183, 1188 (D.C.Cir.1983). The court reviewed and affirmed the Authority's application of that test in *AFGE, Local 1923 v. FLRA,* 819 F.2d 306, 310 (D.C.Cir.1987).

6. The NRC attempts to draw an analogy from *Association of Civilian Technicians, Montana Air National Guard and Department of the Air Force,* 20 FLRA 717 (1985), *pet. for review denied, Association of Civilian Technicians Montana Air Chapter v. FLRA,* 809 F.2d 930 (D.C.Cir. 1987), where the FLRA found nonnegotiable a proposal which would temporarily preclude management from hiring persons outside the Agency to fill vacant positions during a RIF. While the similar public importance of the two Agency missions may be conceded, the proposals at issue differ on one crucial ground. In *Montana Air National Guard, all* hires were precluded; here, despite the NRC's best arguments, it appears that outside hires are permitted. The ability to fill an emergency opening, while imperfect, does exist, and the Agency mission is substantially less affected.

Furthermore, as we discuss below, the proposal's marginal benefit to unit members, combined with substantial adverse consequences to management's reserved rights, renders it non-negotiable as an "appropriate arrangement" for employees adversely affected by the exercise of management rights.[7]

A RIF, though unfortunate in human terms, is certainly an appropriate exercise of the managerial discretion of a government agency. Facially, the proposal at bar is cast in the form of an "arrangement" designed to mitigate the consequences of such an agency action. But, although the proposal may have been calculated to secure the largest number of job openings for current employees in the event of a RIF, with minimal adverse repercussions on the Agency, that is not its effect.

While the NRC as a whole constitutes *one* bargaining unit, it comprises *ten* competitive areas. Under the literal language of the proposal, a RIF limited to one competitive area would freeze promotions and reassignments in all areas. Thus, a RIF of NRC lawyers located at Washington, D.C. would prevent the NRC from filling an engineer vacancy on the West Coast, a position the laid-off lawyers would be neither eligible nor qualified for. Furthermore, under the proposed freeze, management cannot fill the West Coast vacancy at all, unless it hires outside the agency (or, arguably, at least outside the bargaining unit), without regard as to who is best qualified to fill that position. *See Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 857 F.2d 819 (D.C.Cir.1988) (holding nonnegotiable a proposal which provided that inside applicants must be considered first in filling bargaining unit positions). As a RIF is not limited to a particular duration, the vacancy could remain open indefinitely.[8] The

potential for depriving the NRC of key personnel, and contemporaneously of the pool of best qualified applicants, while affixing no precise duration and with little discernible benefit to the bargaining unit members, impermissibly interferes with management's operation of the agency.

Thus, the Union's laudable motives do not disguise the fact that the Union's proposed freeze on competitive promotions and reassignments within the bargaining unit during a RIF excessively interferes with management's reserved right to fill vacant positions with the best qualified candidates from any acceptable source. We do not reject such a measure out of hand. It may be possible to tailor such a freeze sufficiently to accomplish the desired benefits for bargaining unit members while avoiding a dire impact on management's rights and efficient operation. That is not the case here. Accordingly, we deny enforcement to that part of the FLRA order finding negotiable the Union freeze proposal.

### III.

■ As to the two remaining proposals, however, we grant the FLRA's application for enforcement. The proposals dealing with employee assignment rights in the event of a RIF, although also inconsistent with management's reserved rights under § 7106, do not interfere excessively with those rights or contravene applicable government regulations and are consequently negotiable appropriate arrangements.

Government-wide regulations governing reductions-in-force of civilian employees are set out in 5 C.F.R. part 351. In the event of a RIF resulting in the abolition of employee positions, a competitive area is designated, within which employees will compete for retention. 5 C.F.R. § 351.402.

---

**7.** The NRC's claim that the proposal was never intended or framed as an "arrangement" below is unpersuasive. The proposal was included in an article containing proposals dealing with RIFs. The deleterious effects of a RIF upon the personnel of the affected agency are exceedingly obvious. Furthermore, it appears the Union articulated, effectively if not precisely, the appropriate grounds for presenting the proposal.

**8.** The Union argues that the proposal would allow a temporary "detail" of an employee to fill the position. We find this possibility, aside from speculative, contrary to the clear language of the proposal. Occupying a position to any extent is "filling it," in any ordinary sense of the term.

The employees in a particular competitive area compete with each other for remaining positions exclusively on the basis of their relative retention standing.[9] Under the regulations, a competitive area must be "defined solely in terms of an agency's organization unit(s) and geographical location, and it must include all employees within the competitive area so defined." 5 C.F.R. § 351.402(b). Proposals seeking to limit a competitive area solely to bargaining positions have been found to be nonnegotiable because they are inconsistent with this government-wide mandate. *See NTEU and DHHS, Region X*, 25 FLRA 1041 (1987).

Within a competitive area, employees compete within competitive levels. A competitive level is a grouping of positions which, among other things, are in the same position classification series and grade. 5 C.F.R. § 351.403(a). Separate competitive levels must be established for positions in the competitive service and those in the excepted service. 5 C.F.R. § 351.403(b).

The OPM regulations provide that after a competitive service employee is released from a competitive level, the employee will be afforded bump and retreat rights. 5 C.F.R. § 351.701. "Bumping" is the right of one employee to displace another employee in a position on the basis of subgroup superiority. "Retreating" is the right to displace another employee in the same subgroup who is occupying a position which is "the same position, or an essentially identical one, previously held by the released employee." 5 C.F.R. § 351.701(d)(3).

The regulations do not require that excepted service employees be provided with bump and retreat rights. Agencies are authorized, at their discretion, however, to afford excepted service employees bump and retreat rights. 5 C.F.R. § 351.701(a)(3). If such rights are provided to excepted service employees, the regulations require that the rights "[s]hall be uniformly and consistently applied in any one reduction-in-force[.]" 5 C.F.R. § 351.705(b)(2).[10]

The Union's proposals would provide excepted service employees with the same bump and retreat rights as competitive service employees. As mentioned, the NRC has a statutory grant of authority to award such rights. 5 C.F.R. § 351.705(a)(3). We thus find it hard to see how such rights, specifically designated as within the agency's discretion, would not be susceptible to negotiation, unless they are precluded by some other regulatory or statutory provision. *See NTEU, Chapter 6 and IRS, New Orleans District*, 3 FLRA 748, 759–60 (1980).

The NRC has failed to identify any such provisions. However, the NRC does claim that if it grants the Union bump and retreat rights, then under the mandate of 5 C.F.R. § 351.705(b)(2) it must apply such rights uniformly to all employees. As a result, the proposals would have a significant and direct effect on the rights of non-unit employees and would then, in the NRC view, be exempt from negotiation. *See American Federation of Gov't Employees, Local 32 and OPM*, 22 FLRA No. 49 (1986).

The FLRA rejected these contentions. It found that, although the proposals did interfere with management's right to assign personnel, the interference was not excessive and the proposals were a permissible "arrangement" for employees adversely affected by an appropriate exercise of management rights, *i.e.*, a RIF. The FLRA further rejected the NRC's argu-

9. Retention standing is based on a number of factors including the tenure group; the employee's entitlement to veteran's preference; and seniority, with special credit given for certain performance ratings. *See* 5 C.F.R. §§ 351.501–351.504.

10. OPM has issued guidance on the adoption of "bump and retreat" rights for excepted service personnel in the form of FPM Letter 351–22, dated September 17, 1987. Section 5–10(a)(3) of the letter provides that agencies may establish a system of assignment rights for competing employees in the excepted service. While excepted employees have no right of assignment under RIF regulations, an agency may extend rights similar to the provisions in sections 5–4 and 5–5, and subsections 5–10(a)(1) and (2). These rights may be as extensive as those for competitive service employees or more restrictive so long as they are applied consistently.

ments that the proposed reassignment rights violated the RIF regulations because of the potential impact on nonunion employees. In *Merit Systems Protection Board Professional Association and Merit Systems*, 31 FLRA No. 26 (1988), the FLRA decided that a similar proposal establishing bump and retreat rights for excepted service employees: (1) was not determinative of the conditions of employment of non-union employees; (2) was not inconsistent with government-wide regulations, including 5 C.F.R. § 351.705(b)(2) (requiring such rights be applied "uniformly and consistently"); (3) directly interfered with management's determination as to which employees will be assigned or retained; and (4) was an appropriate arrangement under § 7106(b)(3) of the statute. The FLRA insists the same findings are appropriate here.

We agree. On this record, we cannot subscribe to the NRC's contention that the subject proposals adversely affected the working conditions of non-bargaining unit employees. Initially, there is no evidence that any nonunit employee positions would be "bumped" or "retreated through" under the proposal. The NRC's attempt to treat the uniform and consistent language of 5 C.F.R. § 351.705(b)(2) as dictating that an initial decision to extend bump and retreat rights to one class of employee requires that such rights be extended to all employees is unpersuasive. This broad interpretation does not comport with the plain meaning of the statutory language or its context.[11]

Furthermore, there is no indication that the proposal will affect the composition of specific competitive areas or levels. Competitive areas within which RIFs are conducted may not be limited to bargaining unit employees, *see, e.g., NTEU HHS, Region X*, 25 FLRA 1041, 1043–44 (1987), but must, consistent with OPM regulations, be "defined solely in terms of an agency's organization unit(s) and geographical location, and it must include all employees

within the competitive area so defined." *MSPB Professional Association*, at 260 (quoting 5 C.F.R. § 351.402(b)). The NRC, however, is not restricted in defining competitive *levels*, which, among other things, are group positions on the basis of classification services and grade. Bump and retreat rights are afforded to an employee *after* he or she is released from a competitive level. The FLRA determined that these rights would have no effect on whatever competitive area is determined by an agency for RIF purposes. The FLRA found it fully consistent with the RIF regulations to accord bump and retreat rights only to bargaining unit employees released from a competitive level, so long as those rights are uniformly and consistently applied in any one RIF.

Even if the NRC has demonstrated the NTEU's proposals did directly determine conditions of employment of non-unit employees, reversal of the FLRA's determination of negotiability is not warranted. In *AFGE, Local 32 v. FLRA*, 853 F.2d 986 (D.C.Cir.1988), the court rejected the FLRA's position that the effect of a proposal on non-unit employees was dispositive in determining a proposal's negotiability. Specifically, the D.C.Circuit questioned the FLRA's premise that management had *any* right to refuse to bargain over a proposal because of its impact on non-unit employees. In remanding the case, the court strongly recommended that the FLRA adopt the analytical approach used in private sector labor cases—namely, that proposals affecting non-unit employees are within the duty to bargain as long as they "vitally affect" the working conditions of unit employees. *Id.* at 992.

The FLRA has indeed done so. *See AFGE, Local 32 and OPM*, 33 FLRA (No. 41) 335 (October 25, 1988). We find the reasoning of the District of Columbia Circuit, now adopted by the FLRA, persuasive. Accordingly, if the subject proposals "directly affect the conditions of

---

**11.** We further are at a loss to identify the "adverse" impact on nonunit employees caused by an extension of bump and retreat rights to *all* employees, if that is the direct consequence of adopting the union proposal. Surely, nonunit employees will be in a *more* advantageous position with bump and retreat rights than without.

employees outside the bargaining unit," *AFGE*, 33 FLRA (No. 41) at 337, the question then becomes whether the proposals "vitally affect the terms and conditions of employment of bargaining unit employees." *Id.* Although the Union recommends, assuming a finding of impact on non-unit employees, a remand to the FLRA for a determination in light of this new test, we find it clear from the record and our discussion above that the subject proposal (1) vitally affects the working conditions of employees in the bargaining unit [12] and (2) is not inconsistent with applicable law or regulations. *See supra. See generally AFGE*, 33 FLRA (No. 41) at 338.

In sum, the FLRA properly found the Union proposals concerning bump and retreat rights negotiable, and its order as to these proposals is

ENFORCED.

---

**12.** It is difficult to imagine an issue of more vital concern to any employee than the forced termination of his or her employment.