**OVERSEAS EDUCATION ASSOCIATION, INC.,** Petitioner,

v.

**FEDERAL LABOR RELATIONS AUTHORITY,** Respondent.

**OVERSEAS EDUCATION ASSOCIATION, INC.,** Petitioner,

v.

**FEDERAL LABOR RELATIONS AUTHORITY,** Respondent.

Nos. 87–1468, 87–1575.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1988.

Decided May 25, 1989.

Richard J. Hirn, with whom Ronald R. Austin, Washington, D.C., was on the brief, for petitioner.

William R. Tobey, Atty., Federal Labor Relations Authority, with whom William E. Persina, Acting Sol., Federal Labor Relations Authority, Washington, D.C., was on the brief, for respondent. Susan Berk and Jill A. Griffin, Attys., Federal Labor Relations Authority, Washington, D.C., also entered appearances for respondent.

Before SPOTTSWOOD W. ROBINSON, III, STARR and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Concurring opinion by Circuit Judge BUCKLEY, with whom Circuit Judge STARR joins.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

Invoking the Federal Service Labor–Management Relations Act,[1] the Overseas Education Association (OEA) submitted proposals to the Department of Defense Dependents Schools (DODDS) with a view to mitigating the impact of changes by DODDS in the working conditions of teachers and other professionals employed overseas. DODDS refused to negotiate with OEA on the propositions at issue here, and on each of two administrative appeals[2] the Federal Labor Relations Authority sustained the agency's position.[3] We conclude that the Authority's construction of pertinent provisions of the Act improperly restricted the scope of management's duty to bargain. Accordingly, we reverse the Authority's decisions in the respects challenged, and remand the cases for further proceedings.

## I. THE BACKGROUND

### A. *The Statutory Framework*

The Act reflects a comprehensive effort by Congress to balance the interest of the Government in efficient operation with the interest of employees in decisions affecting them.[4] The Act declares broadly that "[e]ach employee shall have the right ... to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees...."[5] This right is enlivened by an

---

1. Pub.L. No. 95–454, tit. VII, 92 Stat. 1191 (1978), 5 U.S.C. § 7101 *et seq.* (1982 & Supp. IV 1986) [hereinafter cited as codified].

2. Pursuant to 5 U.S.C. § 7105(a)(2)(D)–(E) (1982).

3. *Overseas Educ. Ass'n,* 28 F.L.R.A. (No. 88) 700 (1987) [hereinafter *OEA I*]; *Overseas Educ. Ass'n,* 29 F.L.R.A. (No. 56) 628 (1987) [hereinafter *OEA II*].

4. Congress found that "(1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—(A)

safeguards the public interest, (B) contributes to the effective conduct of public business, and (C) facilitates and encourages the amicable settlements [sic] of disputes between employees and their employers involving conditions of employment; and (2) the public interest demands the highest standards of employee performance and the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government." 5 U.S.C. § 7101 (1982).

5. *Id.* § 7102(2).

obligation on agencies and unions alike to meet and bargain in good faith.[6]

■■■ Section 7106(a) of the Act, however, removes from the duty to bargain management functions which Congress deemed essential to effective conduct of agency business.[7] Union proposals that would interfere directly with an exercise of rights reserved to management by Section 7106(a) are presumptively nonnegotiable.[8] But Section 7106(b) authorizes bargaining over proposals in either of three categories, notwithstanding some intrusion on Section 7106(a) prerogatives.[9]

Centrally involved in the cases before us are the Section 7106(a) reserved management right to direct work, and assign employees, and the Section 7106(b)(3) sanction of bargaining over proposals of "appropriate arrangements for employees adversely affected by the exercise of any authority under [Section 7106(a)] by ... manage-

ment officials."[10] By the terms of the Act, tensions between powers asserted by management and union officials are resolved by the Authority on negotiability appeals,[11] and the Authority's decisions are reviewable by the courts of appeals.[12]

### B. *The Facts and Procedural History*

DODDS, a unit of the Department of Defense, operates more than 250 schools for dependents of American servicepersons stationed in twenty countries abroad. OEA is the collective bargaining representative of all teachers, counselors and other professionals employed at these schools.[13]

In 1984, DODDS administrators announced changes in work assignments of overseas personnel. Hiring of substitute teachers would be reduced; whenever possible, full-time teachers, during what otherwise would be their planning and lunch

---

6. *Id.* § 7114(a)(4). See also *id.* § 7103(a)(12) (defining collective bargaining).

7. *Id.* § 7106(a). The duty to bargain is limited in other respects as well. For example, the definition of "conditions of employment" in § 7103(a)(14) excludes policies, practices and matters regarding prohibited political activities or classification of positions, and matters specifically provided for by federal statute. Section 7117 forecloses bargaining where it would be inconsistent with some other applicable law.

8. *AFGE, Local 1923 v. FLRA,* 260 U.S.App.D.C. 346, 819 F.2d 306 (1987); *AFGE, Local 2782 v. FLRA,* 226 U.S.App.D.C. 446, 702 F.2d 1183 (1983).

9. Section 7106(b) provides:
   (b) Nothing in this section shall preclude any agency and any labor organization from negotiating—
   (1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;
   (2) procedures which management officials of the agency will observe in exercising any authority under this section; or
   (3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.
   5 U.S.C. § 7106(b). It should be remembered, though, that even a proposal fitting into one of these categories is nonnegotiable if the end result would be immoderate interference with a

reserved management right. *AFGE, Local 1923 v. FLRA, supra* note 8, 260 U.S.App.D.C. at 348, 819 F.2d at 308 (proposal nonnegotiable because it encroached too greatly on management's right to decide whether to retain ineffective employees); *AFGE, Local 2782 v. FLRA, supra* note 8, 226 U.S.App.D.C. at 451, 702 F.2d at 1188 ("[u]ndoubtedly, some arrangements may be inappropriate because they impinge upon management prerogatives *to an excessive degree*" (emphasis in original)); *Horner v. Bell,* 825 F.2d 382, 389–390 (Fed.Cir.1987) (following *AFGE, Local 2782 v. FLRA*).

10. See note 9 *supra.*

11. Typically, management refuses to bargain on a particular proposal and the union petitions for review by the Authority. *Id.* § 7117(c)(2). Within 30 days of receipt of a copy of the petition, that agency must give written notice of its reasons to the union. *Id.* § 7117(c)(3). Thereafter, the union responds to the agency's explanation. *Id.* § 7117(c)(4). The Authority must issue a written decision, setting forth specific reasons, as to whether the proposal is within or without the scope of the duty to bargain, *id.* § 7117(c)(6), and must order bargaining when appropriate. *Id.* at § 7105(g)(3).

12. *Id.* § 7123. Either the employing agency or the union may appeal. *Id.*

13. OEA has been the certified representative of most of these employees since 1967, and their exclusive representative since 1982. Brief for Petitioners at 2.

periods, would cover classes of absent teachers. Similarly, hiring of outside help to monitor lunchrooms and playgrounds would be discontinued; full-time teachers and professionals would handle these chores in lieu of planning and lunch. The teaching day would be lengthened by fifteen minutes, another class period would be added, and the semester examination period would be shortened to two days.

OEA advanced a number of proposals designed to minimize the effect—primarily, loss of planning and lunch breaks—of these changes upon teachers and professionals.[14] DODDS bargained on some of these proposals but declined to do so on others. OEA appealed to the Authority for determinations on whether the rejected proposals were negotiable.[15]

Later, in 1987, DODDS modified the structure of compensatory education programs at its schools in such ways as to increase the workloads of compensatory education teachers.[16] OEA recommended three methods of easing the transition to the heavier workloads. DODDS spurned bargaining over one of these proposals, which sought more preparation time for compensatory education teachers handed

additional duties.[17] OEA solicited the Authority's decision on this refusal as well.[18]

In separate opinions, the Authority upheld DODDS on the proposals under review.[19] By its estimate, OEA's proposals interfered directly with management's reserved right to assign work, and therefore were nonnegotiable unless they fell within one of the categories specified in Section 7106(b).[20] OEA contended, however, that its submissions qualified for bargaining under Section 7106(b)(3) as proposals of arrangements appropriate for adversely affected employees.[21] It argued that its members were impacted, primarily because the changes wrought by DODDS forced them to perform, without additional compensation, some of their work on their own time at home.

The Authority assumed the accuracy of these representations but disposed of the union's petitions solely on the grounds that the proposals concerned no more than "the effects of management's establishing job requirements," and that "[t]he establishment of job requirements, however, does not by itself adversely affect employees."[22] Dissatisfied, the union brought the litigation here.

**14.** With regard to the new policy on substitutes, OEA proposed that "[t]o compensate for the loss of preparation time, unit employees will not be assigned nonprofessional duties"—lunchroom or playground monitoring. *Overseas Educ. Ass'n,* No. O–NG–1115, Joint Appendix (J.App.) 4 (petition). Respecting lunchroom supervision, the proposal was that "[a]ffected unit employees shall be provided a duty-free lunch period if requested by the unit employee. . . ." *Id.* at 11. As to lengthening of the workday, OEA requested that the "[e]mployer shall make every reasonable effort to provide a reasonable amount of preparation time for each impacted unit employee during the employee's instructional day." *Id.* at 14. To alleviate the burden of preparing for additional classes, OEA suggested, among other things, that teachers not be assigned subjects different than those for which they were already prepared. *Id.* at 19. See also *Id.* at 16 (proposals respecting semester examinations).

**15.** *Id.* at 1.

**16.** For example, before these alterations, relatively large school-based committees designed the curriculae for compensatory education classes. After the change, compensatory education teachers were solely responsible for cur-

riculum planning. Brief for Petitioner at 16–17; see J.App. 151–154 (manual for compensatory education).

**17.** *Overseas Educ. Ass'n,* No. O–NG–1312, J.App. 139 (petition).

**18.** *Id.*

**19.** *OEA I, supra* note 3, 28 F.L.R.A. (No. 88) at 700; *OEA II, supra* note 3, 29 F.L.R.A. (No. 56) at 628.

**20.** *OEA I, supra* note 3, 28 F.L.R.A. (No. 88), at 630, 639, 642, 645, 648–649; *OEA II, supra* note 3, 29 F.L.R.A. (No. 56), at 702. OEA concedes the validity of this conclusion. Brief for Petitioner at 8.

**21.** *Overseas Educ. Auth.,* No. O–NG–1115, *supra* note 14, J.App. 1–23; *Overseas Educ. Auth.,* No. O–NG–1312, *supra* note 17, J.App. 139–143. See also Brief for Petitioners at 20–31.

**22.** The full discussion of the Authority on this point was as follows:

We turn now to the question of whether [the proposals], in spite of the fact that they

## II. THE STANDARD OF REVIEW

Our review of an agency's construction of its enabling statute is guided by the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,[23] and its progeny. "First, always, is the question whether Congress has directly spoken to the precise question at issue."[24] "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue,"[25] "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[26] "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."[27] "If, however, the court determines Congress has not directly addressed the precise question at issue,"[28] "the ques-

interfere with management's right [to assign work] under section 7106(a)(2)(B), are nevertheless negotiable as appropriate arrangements for employees adversely affected by the exercise of that right within the meaning of section 7106(b)(3). The threshold question is whether the proposals are "arrangements" for adversely affected employees. *See National Association of Government Employees, Local R14–87 and Kansas Army National Guard,* 21 FLRA No. 4 (1986). The Union states that the purpose of the proposal[s] is to mitigate the adverse effects on certain unit employees of being required to perform additional duties under certain circumstances—the duties of teachers who are absent and nonprofessional duties. Assuming for the purpose of this decision that these additional job requirements result from management's decision to limit the situations when substitute teachers are hired, as the Union claims, in our view it follows that these proposals concern the effects of management's establishing job requirements.

The establishment of job requirements, however, does not by itself adversely affect employees. *See Department of Health and Human Services, Social Security Administration v. FLRA,* 791 F.2d 324 (4th Cir.1986), *reversing National Federation of Federal Employees, Council of Consolidated SSA Locals and Department of Health and Human Services, Social Security Administration,* 17 FLRA 657 (1985), (employees are not adversely affected because the requirements of their jobs are changed—adverse effect comes when action is taken against them based upon application of those job requirements). *Accord Alford v. Department of Health, Education and Welfare,* 1 MSPB 305 (1980) (employees may not appeal from the Agency's development of performance standards for their positions but only from actions taken against them on the basis of those standards). Therefore, these proposals do not concern "arrangements" for adversely affected employees. Consequently, we need not reach the question whether they are "appropriate" arrangements, since they do not qualify for consideration under section 7106(b)(3). *See Patent Office Professional Association and Patent and Trademark Office, Department of Commerce,* 25 FLRA No. 29 (1987) (Proposal 3 K), *petition for review filed*

*sub nom. Patent Office Professional Association v. FLRA,* No. 87–1135 (D.C.Cir. March 26, 1987).
*OEA I, supra* note 3, 28 F.L.R.A. (No. 88) at 703–704; *OEA II, supra* note 3, 29 F.L.R.A. (No. 56) at 630–631.

**23.** 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**24.** *Id.* at 842, 104 S.Ct. at 2781, 81 L.Ed.2d at 702–703. See also *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429, 441 (1987); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 445 n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434, 456 n. 29 (1987).

**25.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781–2782 n. 9, 81 L.Ed.2d at 703 n. 9. See also *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 441–442; *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 447–448 & n. 29, 107 S.Ct. at 1220–1221 & n. 29, 94 L.Ed.2d at 456–457 & n. 29.

**26.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 842–843, 104 S.Ct. at 2781, 81 L.Ed.2d at 703 (footnote omitted). See also *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 441–442; *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 446–448 & n. 29, 107 S.Ct. at 1220–1221 & n. 29, 94 L.Ed.2d at 456–457 & n. 29.

**27.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, 81 L.Ed.2d at 703 n. 9 (citations omitted). See also *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 447–448 & n. 29, 107 S.Ct. at 1220–1221 & n. 29, 94 L.Ed. 2d at 456–457 & n. 29.

**28.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 843, 104 S.Ct. at 2781–2782, 81 L.Ed.2d at 703.

tion for the court is whether the agency's answer is based upon a permissible construction of the statute." [29]

Our examination of the pivotal provisions of the Act, the legislative history of those provisions, and the legislative scheme leads us to conclude that Congress made clear enough the meaning to be ascribed to the words "adversely affected" in Section 7106(b)(3), and did not intend the reading the Authority gave them. Since the Authority's interpretation does not survive the first phase of the *Chevron* inquiry, we do not reach the second. Thus we neither defer to nor abide the decisions under review.

## III. THE STATUTORY LANGUAGE

■ The Authority argues here that employees are not adversely affected by management's specification of new job requirements unless and until an adverse personnel action [30] is taken against someone for failing to perform adequately under those requirements.[31] As the Authority puts it, adverse effects within the sphere of Section 7106(b)(3) can only be unfavorable

job actions such as removals, demotions and reductions in pay.[32] This position is rested, not on statutory structure, language or history, but on an extrapolation of decisions dealing with promulgation of performance standards.[33]

The statutory words do not themselves import any such limit. *Webster's* defines "adverse" as including "acting against or in a contrary direction" or "in opposition to one's interests," [34] and "affect" as including "to produce an effect ... upon." [35] Taken together, these expansive words do not confine themselves to employees subjected to serious adverse personnel actions.

Moreover, we hardly need to do more than to examine the structure of Section 7106 to obtain a clear idea of the meaning of "adversely affected." Section 7106(a), as we have said, enumerates the prerogatives reserved to management,[36] but the immunity of these rights from the duty to bargain is "[s]ubject" to Section 7106(b)(3).[37] The latter section, in plain English, authorizes negotiation of "appropriate arrangements for employees adversely affected," not by a firing, demotion or pay cut, but by "the exercise of *any*

---

**29.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (footnote omitted). See also *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 442; *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29.

**30.** 5 U.S.C. § 7501, *et seq.* (1982).

**31.** Brief for Respondents at 10–19.

**32.** As the Authority puts it, until the new requirements have been "applied" to some employee. Brief for Respondents at 15.

**33.** See Part VI *infra.*

**34.** *Webster's Third New International Dictionary, Unabridged* 31 (1981).

**35.** *Id.* at 35.

**36.** See text *supra* at notes 6–8.

**37.** 5 U.S.C. § 7106(a) (1982).

Situations of this sort include those in which Congress, either explicitly or implicitly, left a gap for the agency to fill, *id.* at 843–844, 104 S.Ct. at 2782, 81 L.Ed.2d at 703; *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 445 n. 29, 107 S.Ct. 1220 n. 29, 94 L.Ed.2d 456 n. 29; those where "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703; see also *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 442; *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29; and " 'whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.' " *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 844, 104 S.Ct. at 2782–2783, 81 L.Ed.2d at 704 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908, 914 (1961) (citations omitted)). See also *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29.

authority under this section by such management officials."[38] Indubitably, promulgation of new work requirements is an exercise of authority under Section 7106(a), and the Authority was badly mistaken in imposing upon "adversely affected" a circumscription that those words simply do not bear.

## IV. THE LEGISLATIVE HISTORY OF SECTION 7106[39]

While we all are satisfied that the statutory text itself demonstrates the error in the Authority's construction of Section 7106(b)(3), I have also examined the legislative history,[40] and there I find abundant support for the conclusion that Congress intended the words "adversely affected" to convey a much broader meaning than the Authority thought. More specifically, the history demonstrates overwhelmingly that Section 7106(b)(3) was designed to enable employees impacted by any application of reserved management rights to negotiate on proposals promising some mollification of the consequences. This is the objective with which the Authority's construction of "adversely affected" collides fatally.[41]

Section 7106(a) codified the management rights provision of Executive Order 11491,

38. *Id.* § 7106(b)(3) (emphasis added). See also *OPM v. FLRA,* 274 U.S.App.D.C. 362, 369, 864 F.2d 165, 172 (1988) (§ 7106(b) clearly provides exceptions to management rights under § 7106(a), and agency cannot circumvent § 7106(b) exceptions by promulgating regulations tracking only § 7106(a)); *Association of Civilian Technicians v. FLRA,* 244 U.S.App.D.C. 151, 159, 756 F.2d 172, 180 (1985) ("proposals to make 'appropriate arrangements' for employees adversely affected by a [reduction in force] are negotiable under subsection (b)(3) even if they would directly interfere with the exercise of management's authority under subsection (a)"); *Local 32, AFGE v. FLRA,* 234 U.S.App.D.C. 292, 294, 728 F.2d 1526, 1528 (1984) ("Act's legislative history further supports a reading of § 7106(b)(3) as permitting the negotiation of some constraints on § 7106(a) management prerogatives"); *AFGE, Local 1923 v. FLRA, supra* note 8, 260 U.S.App.D.C. at 348, 819 F.2d at 308 ("[i]f implementation of the proposed arrangement would not interfere excessively with managerial prerogatives, it is appropriate and therefore negotiable").

39. My concurring brethren decline to consider the legislative history. The views expressed in this Part IV are mine alone. Judge Buckley's concurring opinion, in which Judge Starr joins, states the majority position of this panel. I address their concerns in note 41 *infra.*

40. See *NLRB v. United Food & Commercial Workers, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 429; *INS v. Cardoza Fonseca, supra* note 24, 480 U.S. at 446–449 & n. 29, 107 S.Ct. at 1220–1221 n. 29, 94 L.Ed.2d at 456 & n. 29; *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra* note 23, 467 U.S. at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704.

41. My colleagues disapprove of any resort to the Act's legislative history for additional illumination of the meaning Congress intended "employees adversely affected" to convey. Concurring Opinion (C.Op.), *post.* Their first objection is

that "a judicial determination that statutory language is clear ordinarily forecloses further inquiry into legislative intent." *Id.* at 1. I readily agree that when the statutory words themselves make that meaning very clear, consideration of legislative history may well be omitted. E.g., *Burlington N. R.R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404, 412 (1987). But, as the Supreme Court has pointed out, "[w]hen aid to the construction of the meaning of words, as used in the statute, is available, there certainly can no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, 1351 (1940) (footnote omitted). Accord, *Train v. Colorado Pub. Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434, 441 (1976); *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479, 63 S.Ct. 361, 362, 87 L.Ed. 407, 410 (1943); *Air Reduction Co. v. Hickel,* 137 U.S.App.D.C. 24, 27 n. 2, 420 F.2d 592, 595 n. 2 (1969); *Baltimore & O. R.R. v. Jackson,* 98 U.S.App.D.C. 169, 172 n. 8, 233 F.2d 660, 663 n. 8 (1956) (same quotation), *aff'd* 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed.2d 862 (1957). See also *K–Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, ——, 108 S.Ct. 1811, 1822, 100 L.Ed.2d 313, 330 (1988) (Brennan, J., concurring in part and dissenting in part) (relevant tools for determining intent of Congress are language, purpose and legislative history); *FERC v. Martin Exploration Management Co.,* 486 U.S. 204, ——, 108 S.Ct. 1765, 1768–1770, 100 L.Ed.2d 238, 245–246 (1988) (legislative history examined in process of determining that the "plain meaning of the statute decides the issue presented"); *United States v. James,* 478 U.S. 597, 608, 106 S.Ct. 3116, 3123, 92 L.Ed.2d 483, 495 (1986) ("the legislative history fully supports attributing to the unambiguous words of the statute their ordinary meaning"); *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174, 188 (1986) ("in light of the language of the Act as a whole, the legislative history of [the relevant

section], the congressional purposes underlying the Act, and the importance of uniformity of admiralty law," respondent's position cannot be maintained), *id.* at 237, 106 S.Ct. at 2502, 91 L.Ed.2d at 199 (Powell, J., concurring in part and dissenting in part) ("[t]he terms of the provision are clear,.... The congressional debate and other legislative history cast no doubt on the plain meaning...."). We ourselves have said that "[e]ven when the language of a statute is unambiguous, the legislative history may throw new light onto its meaning[,] ..." and thus "we [did] not stop with the determination that the meaning of the word 'agency' is 'clear' without the legislative history." *Air Reduction Co. v. Hickel, supra,* 137 U.S.App.D.C. at 27 n. 2, 420 F.2d at 595 n. 2 (citation omitted). And the Supreme Court has observed that "[i]t would be anomalous to close our minds to persuasive evidence of intention on the ground that reasonable men could not differ as to the meaning of the words." *United States v. Dickerson,* 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356, 1362 (1940).

These considerations exert equal force when the technique of interpretation becomes an issue in a *Chevron*-type context, as it does here. As has been stated, the initial step the *Chevron* analysis is an examination of the statutory language to ascertain whether Congress manifested an intention on the question presented. See text *supra* at notes 24–27. This court has explained that "[t]his examination should begin with the language of the statute, but the court may also inspect legislative history and past administrative practice for any light these sources may shed on congressional intent." *Abourezk v. Reagan,* 251 U.S.App.D.C. 355, 365, 785 F.2d 1043, 1053 (1986) (citation omitted) *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). This advice is fully authenticated by Supreme Court caselaw. At the first *Chevron* phase, the court is to "employ[ ] traditional tools of statutory construction," see text *supra* at note 25, and the legislative history is one of these tools, whether the statutory words are unambiguous or not. So it was in the *Chevron* trilogy. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, supra* note 23, 467 U.S. at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704 (first-stage determination "[b]ased on ... examination of the legislation and its history"); *INS v. Cardoza–Fonseca, supra* note 24, 480 U.S. at 432 n. 12, 107 S.Ct. at 1213 n. 12, 94 L.Ed.2d at 448 n. 12 (since "the plain language of the statute appears to settle the question before us[,] ... we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to the language," but, "far from causing us to question the conclusion that flows from the statutory language, the legislative history adds compelling support to our holding"); *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 442 (first-stage inquiry extends to "[t]he words, structure, and history of the" statute). So it has been in our decisions. *South Carolina Pub. Serv. Auth. v. FERC,* 271

U.S.App.D.C. 95, 98, 850 F.2d 788, 791 (1988) ("[w]e ... turn to the language and to the history of the [statute] respectively, in order to do 'our first job' of determining Congress's intent"); *Costello v. Agency for Int'l Dev.,* 269 U.S.App.D. C. 47, 49, 843 F.2d 540, 542 (1988) (doing "our first job," we resort to "[t]he words, structure, and history of the" statute). So, also, I think it should be here.

My colleagues' reservations about legislative history extend even to committee reports, C.Op. at 974, which, as they concede, have traditionally been considered to be the most reliable of historical aids to statutory interpretations. E.g., *United States v. UAW,* 352 U.S. 567, 585–586, 77 S.Ct. 529, 538, 1 L.Ed.2d 563, 574–575 (1957); *American Airlines, Inc. v. CAB,* 125 U.S.App.D.C. 6, 16, 365 F.2d 939, 949 (1966). Their already dim view of the history generally becomes dimmer when it comes to statements by sponsors of legislation. C.Op. at 975. But no one can gainsay the overwhelming judicial support for the proposition that explanations by sponsors of legislation during floor discussion are entitled to weight when they cast light on the construction properly to be placed upon statutory language. This principle is firmly imbedded in the jurisprudence of the Supreme Court, e.g., *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–527, 102 S.Ct. 1912, 1920–1921, 72 L.Ed.2d 299, 311 (1982) ("remarks ... of the sponsor of the language ultimately enacted[ ] are an authoritative guide to the statute's construction"); *Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715, 724 (1982) (sponsor's statements entitled to weight); *Lewis v. United States,* 445 U.S. 55, 63, 100 S.Ct. 915, 919, 63 L.Ed.2d 198, 207–208 (1980) (same); *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357, 375 (1967) ("[i]t is the sponsors that we look to when the meaning of the statutory words is in doubt") (quoting, *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–395, 71 S.Ct. 745, 750–751, 95 L.Ed. 1035, 1047–1048 (1951)); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 288 n. 22, 76 S.Ct. 349, 361 n. 22, 100 L.Ed. 309, 323 n. 22 (1956) (same); our circuit, e.g., *Symons v. Chrysler Corp. Loan Guar. Bd.,* 216 U.S.App.D.C. 80, 84–85, 670 F.2d 238, 242–243 (1981) (sponsor's remarks "some evidence of Congress' views"); *AFGE v. Donovan,* 244 U.S.App.D.C. 255, 277 & n. 17, 757 F.2d 330, 352 & n. 17 (1985) (cosponsor's remarks deemed relevant); *City of New York v. Train,* 161 U.S.App.D.C. 114, 120, 494 F.2d 1033, 1039 (1974), *aff'd* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1977) (views of legislation's sponsors are of "particular importance") and sister circuits, e.g., *Carlin Communications, Inc. v. FCC,* 749 F.2d 113, 116 n. 7 (2d Cir.1984) ("[w]hile the views of a sponsor of legislation are by no means conclusive, they are entitled to considerable weight, particularly in the absence of a committee report"); *Church of Scientology v. United States Dep't of Justice,* 612 F.2d 417, 423–426 & n. 13 (9th Cir.1979) ("[c]ourts look to the statements by the initiators or sponsors of

the predecessor of the Act. The committee reports and floor debates reveal that legislators were particularly concerned that Section 7106(a) would be given such an expansive interpretation that it would foreclose bargaining over proposals entirely suitable for that process.[42] In the House, supporters of the legislation emphasized that Section 7106(a)'s grant of management rights was to be construed narrowly,[43] and that

the range of topics appropriate for collective bargaining was to enlarge.[44] Key legislators criticized the propensity of the Authority's predecessor, the Federal Labor Relations Council, to stretch the management rights language of the executive order,[45] and left no doubt that any tendency in that direction was to be shed whenever the Act became the subject of interpretation.[46]

proposed legislation when the meaning of the words used in the statute is in doubt"); *Kansas ex rel. Stephan v. Adams,* 608 F.2d 861, 865–866 (10th Cir.1979) (statements of one of bill's sponsors "deserve to be accorded substantial weight in interpreting the statute"). Representatives Udall and Clay, upon whom I draw for enlightment, were first-rate sponsors—authors, committee members and active collaborators—of the provision that became Section 7106(b)(3) of the enacted measure and clearly were authoritative spokesmen on the meaning it was intended to have. Their explanations are fully consistent with the statutory language, the structure of the Act and the remaining legislative history. See, e.g., *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248, 257–258 (1986) (when statements of sponsor of legislation "are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent"). It is noteworthy that in *Simpson v. United States,* 435 U.S. 6, 13, 98 S.Ct. 909, 913, 55 L.Ed.2d 70, 77 (1978), eight justices accepted the explanation of the sponsor of an amendment notwithstanding a dissent expressing objections similar to those my colleagues voiced here. *Id.* at 13, 17–18, 98 S.Ct. at 913, 915, 55 L.Ed.2d at 77, 80. The Court's majority characterized this statement as "clearly probative of a legislative judgment" and "certainly entitled to weight." *Id.* at 13, 98 S.Ct. at 913, 55 L.Ed.2d at 77.

The concurring opinion also claims that the legislative history places a gloss on the statutory text which could "[i]n time ... supplant the plainest statutory meaning." C. Op. at 975–76. They are concerned that the comments I quote "might threaten the balance Congress has struck between federal employees' rights and management's prerogatives." *Id.* This criticism rests upon a misreading of my purpose in citing legislative history. I do so, not to probe the relationship between §§ 7106(a) and 7106(b)(3) —indeed, our decision in *AFGE v. FLRA,* 226 U.S.App.D.C. 446, 451, 702 F.2d 1183, 1188 (1983) has already established the subordination of § 7106(a) management rights to § 7106(b)(3)'s demand for negotiation—but rather to portray the legislative atmosphere in which § 7106(b)(3) was composed and adopted. See text *infra* following note 60. At any rate, sponsors' statements can be taken only as found, and can be utilized only as warranted by

the principles shaping their role in statutory construction. They are not controlling; they are merely aids to interpretation. But ordinarily they do bear significance—just how much varies from case to case. See *United States v. Oates,* 560 F.2d 45, 70 n. 26 (2d Cir.1977) ("[t]he weight to which the views of any particular congressman is entitled will vary, of course, with the legislator's familiarity with, and participation in the shaping of, the legislation"). It is a far cry, however, to say, as my colleagues do, that sponsors' statements should have no significant role at all.

42. See notes 43–57 *infra.*

43. For example, Representative Clay, one of the authors of § 7106, declared, "[a]s the sectional analysis makes clear, the management rights clause is to be construed as a narrow exception to the general obligation to bargain in good faith." 124 Cong.Rec. 29,187 (1978). See also text *infra* at notes 45–47.

44. See notes 45–47 *infra.*

45. For instance, Representative Udall, who provided the sectional analysis, reminded his colleagues that

[t]oo often the [Federal Labor Relations] Council interpreted the management rights clauses so broadly as to stifle an attempt by both management and employees to address commonly recognized problems. The original intention merely to insure that essential aspects of managing the agency were not subject to negotiations has been thwarted.

124 Cong.Rec. 29,198 (1978). See also note 46 *infra.*

46. The House Committee on the Post Office and Civil Service stated:

The committee's intention in section 7106 is to achieve a broadening of the scope of collective bargaining to an extent greater than the scope has been under the Executive Order program, but to preserve the essential prerogatives and flexibility Federal managers must have. The "management rights" language of Executive Order 11491 has been a substantial barrier against negotiations. The committee intends that section 7106—which retains several of management's rights under the Executive Order, but also eliminates several—be

In attaining these ends, Section 7106(b) was to play an important role. Representative Udall, a major sponsor of the bill, described the intended effect of Section 7106(b):

> In drafting a revision of HR 9094 as title VII of this bill, Mr. Clay and I attempted to alleviate these problems with the Executive order in three ways.... Second, we expressly provided in the language of title VII itself that negotiations may occur over the adverse impact caused by the exercise of *any of the management rights* in title VII and that procedures may be negotiated for the exercise of those rights. Third, we attempted to make clear that the purpose of the management rights clause is to preserve the ultimate exercise of the management functions listed. As such, the management rights clause operates as an exception to the general obligation to bargain in good faith over conditions of employment.[47]

Representative Udall further explained that Section 7106 "will adequately protect genuine managerial prerogatives,"[48] and as long as it is "construed strictly, such a clause will also allow the flexibility that is the hallmark of a successful labor-management program. Thus, although management has the right to direct the work force, proposals aimed at lessening the adverse impact on employees of an exercise, perhaps arbitrary, of that right are fully negotiable."[49] Representative Clay was in full accord:

> read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal.
> H.R.Rep. No. 1403, 95th Cong., 2d Sess. 43–44 (1978).

**47.** 124 Cong.Rec. 29,198 (1978) (emphasis added).

**48.** *Id.* at 29,199.

**49.** *Id.*

**50.** *Id.* at 29,187 (emphasis added).

**51.** "In prescribing regulations relating to personnel policies and practices and working conditions, an agency shall give due regard to the obligation to negotiate imposed by this section, except that such obligation does not include an

Although more management rights have been added [in Section 7106(a) ], the section has been revised to make clear that the exercise of *any* management rights in the section does not preclude negotiations over procedures *or adverse effects* involved in [the exertion of] those rights.[50]

The Senate bill deviated somewhat from the House measure in wording of the provision ultimately enacted as Section 7106(b)(3). Like the House, the Senate listed prerogatives reserved to management, but then specified that this tabulation "shall not preclude the parties from negotiating agreements providing appropriate arrangements for employees adversely affected by the impact of realignment of work forces or technological change."[51] The message conveyed by this language is unmistakable, and in harmony with the spirit and purpose of its broader counterpart in the House. As the Senate Committee on Governmental Affairs explained, the Senate version would "except[ ] certain enumerated matters from the obligation to negotiate ..., in effect rendering bargaining on those matters optional or permissive," but "recognize[d] that there is an obligation to negotiate over the impact of realignments of work forces and technological change."[52] The Senate never indicated any disagreement with the Committee's reading.[53]

Both Houses, then, manifested a desire to subject, though to varying extents, pro-

obligation to negotiate with respect to matters concerning the number of employees in an agency, the numbers, types, and grades of positions or employees assigned to an organizational unit, work project or tour of duty, or the technology of performing the agency's work. The preceding sentence shall not preclude the parties from negotiating agreements providing appropriate arrangements for employees adversely affected by the impact of realignment of work forces or technological change." S. 2640, 95th Cong., 2d Sess. (1978), *reproduced in* S.Rep. No. 969, 95th Cong., 2d Sess. 208–209 (1978).

**52.** S.Rep. No. 969, 95th Cong., 2d Sess. 105 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2723, 2827.

**53.** 124 Cong.Rec. 33,388–33,390 (1978).

posals implicating reserved management rights to bargaining over impacts resulting from exercises of those rights. The only difference between the Senate and House provisions on impact negotiation lay in the sort of management activity needed to activate the process. The Senate sanctioned bargaining over "agreements providing appropriate arrangements for employees adversely affected by the impact of realignment of work forces or technological change."[54] The House imposed no limitation; bargaining was always in order when the subject would be suitable arrangements for employees adversely affected by an exercise of "any" authority under Section 7106(a).[55] As the bills moved through Congress, however, this divergence lost any importance it otherwise might have had. The Conference Committee effected, without discussion, a reconciliation by blending both versions of negotiability and recasting them as the present Section 7106(b).[56] Each House, in turn, accepted the Conference substitute,[57] and thereby established the negotiability of proposals affecting management rights in each of the three instances set forth in that section.

As Section 7106(b)(1) states, some such proposals are, "at the election of the agency," negotiable in their entirety.[58] As Section 7106(b)(2) directs, whenever the agency decides to exercise a right reserved to management, the "procedures which management officials of the agency will observe in" doing so become negotiable.[59] And, by the terms of Section 7106(b)(3), "appropriate arrangements for employees adversely affected by the exercise of any" reserved management right may always be negotiated by such employees.[60] Both the

text and the legislative history of the latter provision—the one bearing critically upon the cases at bar—elucidate its prominance in the legislative scheme.

I cannot believe that Congress, so tightly wedded as it was to impact negotiation over any exertion of Section 7106(a) management rights, contemplated an interpretation of "employees adversely affected" which would drastically curtail that opportunity. On the contrary, every guidepost observed in the legislative history points in the opposite direction. The scope of collective bargaining was to expand. Nonnegotiability of management rights was to be a narrow exception to the general duty to bargain. Section 7106(a) management rights themselves were to be strictly construed, and any doubt was to be resolved in favor of negotiability. Every exercise of any of these rights was potentially to be subject to impact negotiation. So spoke Congress, emphatically and clearly. The legislative history reinforces my conclusion that Congress did not intend to confine the availability of Section 7106(b)(3) to employees encountering such awesome adversities as removals, demotions or pay reductions.

## V. THE STATUTORY SCHEME

Our quest for congressional intent has led us not only through the statutory text and history, but also to an important structural feature of the Act.[61] Congress provided two distinct processes to which, in particular circumstances, disgruntled employees may alternatively resort. One, of course, is collective bargaining;[62] the other

**54.** See note 51 *supra.*

**55.** See note 47 *supra.*

**56.** Section 7106(b)(1) was derived from the Senate bill, and § 7106(b)(2)–(3) from the House bill.

**57.** 124 Cong.Rec. 33,388–33,390 (Senate); 124 Cong.Rec. 24,105 (House).

**58.** 5 U.S.C. § 7106(b)(1).

**59.** *Id.* § 7106(b)(2).

**60.** *Id.* § 7106(b)(3).

**61.** See, e.g., *NLRB v. United Food & Commercial Workers Union, supra* note 24, 484 U.S. at ——, 108 S.Ct. at 421, 98 L.Ed.2d at 441.

**62.** Collective bargaining agreements must "provide procedures for the settlement of grievances, including questions of arbitrability." 5 U.S.C. § 7121(a)(1) (1982). However, "[a]ny collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement." *Id.* § 7121(a)(2). As to the exclu-

is a procedure open to employees against whom an "adverse action" has been taken. The Authority's interpretation of Section 7106(b)(3) is at war with this aspect of the statutory scheme.

The Federal Service Labor–Management Relations Act was adopted as Title VII of the Civil Service Reform Act of 1978,[63] a comprehensive overhaul of laws pertaining to the federal workforce. Besides regulation of labor-management relations in Title VII, the Civil Service Reform Act addresses, among other things, adverse personal actions against federal employees.[64] Adverse actions are removals, suspensions for more than 14 days, reductions in grade or pay, and furloughs of 30 days or less.[65] An adverse personal action against an employee triggers a panoply of procedural safeguards,[66] including judicial review.[67] As is evident, adverse-action proceedings focus upon individual cases.

Section 7106(b)(3), on the other hand, is a collective bargaining measure. It enables employees adversely affected by an exercise of Section 7106(a) management rights, though entirely proper, to bargain over arrangements appropriate to ease the impact of management's action. It thus allows these employees to combine their views and their voices in a concerted responsive effort.

The Authority's interpretation of the words "employees adversely affected" in Section 7106(b)(3) would produce pernicious consequences. In the cases before us, the Authority ruled unequivocally that employees are not adversely affected by changes in job requirements, but become so only when action—obviously, adverse personnel action—is taken against them on grounds of noncompliance with such requirements.[68] The benefit of Section 7106(b)(3) is thus seriously diluted. Of course, an individual employee confronted by an adverse personnel action may invoke the procedures referable specifically to such actions. But when employees as a group are affected by some action of management, Section 7106(b)(3), by the Authority's construction, is of little or no value; group efforts are foreclosed unless and until adverse personnel actions are launched. Even then, it seems, the group could be no larger than those subjected to such actions.

Congress specified that adverse personnel actions be reviewed in individual disciplinary proceedings, not through collective bargaining. At the same time, Congress ordained in Section 7106(b)(3) that the interests of adversely affected employees in arrangements appropriate to an exercise of management rights be advanced through collective representation. Personnel reviews and collective bargaining are distinct, and Congress did not intend that either be denied its proper role. The Authority's interpretation stands the statutory scheme on its head, and is not entitled to deference by the courts.

## VI. THE ADMINISTRATIVE RATIONALE

The Authority felt that the union could not resort to Section 7106(b)(3) because "these proposals do not concern 'arrangements' for adversely affected employees."[69] Rather, the Authority said, "[t]he establishment of job requirements, however, does not by itself adversely affect employees," and that was all that was involved.[70] As a general proposition, this concept of adverse affect is far too cramped, and in its particular application here it is untenable.

The only judicial precedent which the Authority tendered as support for its stance was *HHS v. FLRA*,[71] decided in the Fourth

---

63. *Supra* note 1.

64. 5 U.S.C. §§ 7511–7514 (1982). For provisions governing suspensions for 14 days or less, see *id.* §§ 7501–7504.

65. *Id.* § 7512.

66. *Id.* § 7513.

67. *Id.* § 7513(d) & 5 U.S.C. § 7703.

68. See note 22 *supra*.

69. See note 22 *supra*.

70. See note 22 *supra*.

71. 791 F.2d 324 (4th Cir.1986).

sivity of negotiated grievance procedures, see *id.* § 7121(d).

Circuit. There the Social Security Administration made revisions in the manual used by employees in processing applications for supplemental security income. These revisions necessitated changes in some of the procedures previously utilized by employees, and complete accuracy in conforming to the changes was not expected immediately. The employees' union proposed a six-month moratorium during which errors in applying the revised procedures would be corrected but not charged to employees. The agency refused to negotiate on this proposition, claiming that it interfered with management's right to direct employees and assign work.[72] The Authority disagreed and held the agency to a duty to bargain. The court reversed on the ground that the proposal would produce more than a postponement of the effective date of employee evaluations, for it would deprive the agency of the opportunity to learn how quickly and precisely employees individually could adjust to the new procedures.[73] And with respect to Section 7106(b)(3), the court said:

> We also reject the implicit claim that employees are "adversely affected" by changes and clarifications in the SSA operations manual, or by an evaluation of their ability to learn the new material. We think § 7106(b)(3) permits the union to propose appropriate arrangements for terminated or demoted employees, for example, not employees whose job becomes more demanding because its requirements change. *See, e.g., American Federation of Government Employees, AFL–CIO, Local 2782 v. FLRA*, 702 F.2d

1183 (D.C.Cir.1983) (involving employee demotions).[74]

This, the Authority argues, buttresses its position. Read in context, we think it does not. The agency action involved in *HHS* was simply a substitution of new procedures for some theretofore in vogue. There was no indication that the substitution would exact from employees more than aptitude and willingness to adapt to and utilize the new procedures. So, those procedures did not call for more than the ability—which employees usually are expected to have—to react promptly and efficiently to new demands of the job. To be sure, the revised procedures raised the specter of lower performance ratings until employees gained enough experience to master them, but, here again, that risk did not differ fundamentally from the normal exposure of employees to appraisals of the caliber of their work. Given this, it is hardly surprising that the court concluded that the employees were not adversely affected by either the changes in the agency's operations manual or the anticipated evaluation of individual adjustments thereto.[75] We thus do not attribute to *HHS* the meaning of "adversely affected" which the Authority urges us to adopt here.

The Authority draws attention, however, to the Fourth Circuit's statement on "adversely affected"—that Section 7106(b)(3) authorized the union to submit proposals of suitable arrangements "for terminated or demoted employees," but "not employees whose job becomes more demanding because its requirements change."[76] We read this observation, not as the prescrip-

---

**72.** See 5 U.S.C. § 7106(a)(2) (1982).

**73.** In pertinent part the court said:
We think that a performance standard is not limited to how well an employee performs after a set period, such as six months, but may include how quickly an employee masters new material.... SSA has a great interest in knowing which employees can be counted on for quickly comprehending the ongoing changes and clarifications in the SSA operations manual.... Here we deal with existing employees and the extent to which having learned to perform satisfactorily a given set of instructions, they have the flexibility, the ability and the motivation to respond promptly and accurately to new directions. We think

that it is a part of the rights of management to know which of its employees can readily and accurately adjust to change so that when future changes are contemplated, it has a basis on which to assign existing employees to new tasks with minimum administrative disruption, and perhaps also, to conclude that employees who cannot achieve an average adjustment to change should not be retained. 791 F.2d at 326–327.

**74.** *Id.* at 327.

**75.** See text *supra* at note 73.

**76.** See text *supra* at note 74.

tion of a general rule, but rather as the court's articulation of its conclusion on the facts of the case before it.[77] When an agency establishes performance standards or defines critical job elements, it may or may not be possible at the point of promulgation to predict whether employees will be disadvantaged thereby. Depending upon the circumstances, there may be no impact at all, as when new performance levels are already maintained by employees. There may be some impact, but only *de minimus*, or such impact as there will be does not affect employees "adversely," as when an elimination of idle or unproductive time is all that occurs. On the other hand, a performance standard may be so high, or a redefinition of job elements so radical, that additional burdens of a substantial character are heaped on employees.[78] Between these two poles the situation may well become murky, and more must be learned before a determination on adverse affect can confidently be made. We read the Fourth Circuit's limitation of availability of Section 7106(b)(3) to terminated or demoted employees as no more than a reflection of its conclusion that, in the situation presented, adverse affect could be assured only if and when terminations or demotions occurred.[79]

## VII. CONCLUSION

The question whether employees are adversely affected by an exercise of a reserved management right necessitates close analysis of the relevant facts. Not every change in work requirements, or every added burden of job performance, will present an occasion for Section 7106(b)(3) collective bargaining. The factual scenarios and impact gradations possible are myriad, and a commonsense approach is indispensable. The Authority, to which the responsibility of administering the Federal Service Labor–Management Relations Act has been entrusted, has the duty in the first instance to carefully explore the factual basis of each proposal contested, and to evaluate the proposal in light of its accumulated experience in federal labor-management relations.

In the cases before us, the Authority never measured the impact of management's changes upon the unit employees. Instead, it ruled that the union's proposals really addressed no more than the end result of new work requirements, and that, solely on this account, employees could not be adversely affected. In so doing, the Authority missed the point completely. There were the addition of another class daily, the increased workloads of compensatory education teachers, the lengthening of the work day, and the undisputed fact that on any particular day some teachers must forego their planning or lunch periods, or both, in order to cover the classes of absent teachers, or to monitor the lunch-

---

77. Our view in this regard is reinforced by the court's citation, as the sole authority for this statement, of our opinion in *AFGE v. FLRA*, 226 U.S.App.D.C. 446, 702 F.2d 1183 (1983). The employees there involved had been demoted, through no fault of their own, in the course of a reduction in force; consequently, they undeniably were adversely affected. Section 7106(b)(3) had no role in our decision, and certainly nothing we said supports the Fourth Circuit's statement as a pronouncement of a rule of law. We take it, then, that the court's citation of *AFGE* was as purely for the sake of illustration as its statement was for the sake of explanation.

78. Take, for example, an employee under a duty to process papers, who suddenly is called upon to process twice as many per day as he did previously, when he already was fully occupied throughout the work day. It is easily foreseeable that even with gradually improving techniques increasing his speed, he must perform

some of this work during what previously was off-duty time. Thus, even the "mere promulgation" of performance standards can, in particular instances, adversely affect employees immediately.

79. Even if the proposal at issue in *HHS* could otherwise have qualified under § 7106(b)(3), it likely would have been condemned, at least in this circuit, as itself an excessive interference with an exercise of rights reserved to management. See note 9 *supra*. The proposal set a six-month performance standard of zero percent adjustment to the changed procedures. During that period, management would have been deprived not only of its ability to compel use of the new procedures, but also of the chance to ascertain just how rapidly and efficiently its employees adapted to them. Indeed, we believe that was the rationale of the Fourth Circuit's primary holding in *HHS*. See 791 F.2d at 326–327.

room or the playground. On these days, any need to prepare for next-day classes necessarily must be met at home during what otherwise would have been free personal time. The question for decision was whether, in the aggregate, there was an adverse effect opening the door to collective bargaining over proposals of appropriate ameliorating arrangements. We hold that the Authority erred in deciding, without consideration of the facts bearing on the issue, that there was no such effect.[80]

The orders under review are reversed, and the cases are remanded to the Authority for further proceedings consistent with this opinion.

*So Ordered.*

BUCKLEY, Circuit Judge, with whom Circuit Judge STARR joins, concurring:

We concur in all but Part IV of our colleague's fine opinion. We find its references to legislative history unnecessary, and we cannot accept the use of these extra-statutory materials to place a restrictive gloss on the plain meaning of section 7106(a)'s "management rights" provisions. Before discussing these concerns, we will summarize the basic principles of statutory construction that inform our analysis.

A court's task in interpreting a statute is to determine its meaning as understood by the legislative body that voted the bill into law. The most reliable evidence of that meaning is the text of the act itself. As the Supreme Court has recently emphasized, a judicial determination that statutory language is clear ordinarily forecloses further inquiry into legislative intent: "Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (citation omitted). *See also United States v. Ron Pair Enters., Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1030, 103

L.Ed.2d 290 (1989) ("where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'") (citation omitted).

An exception to this "plain meaning" rule arises in those "'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Id.* 109 S.Ct. at 1031 (citation omitted). For example, a reference to committee reports may reveal that a seemingly unambiguous word or phrase has a specialized or technical meaning that Congress intended to incorporate into the statute. Such a use of legislative materials, however, must be sharply distinguished from the treatment of legislative history as a source of the law itself—that is to say, as expressing a congressional intent that supplants the statute. *See In the Matter of Sinclair*, 870 F.2d 1340, 1342–44 (7th Cir.1989), (Easterbrook, J.).

In the past, courts have often failed to perceive this critical distinction and, more generally, the questionable validity of many of these legislative "aids." In recent years, however, this Circuit and others have expressed increasing concern over the reliability of legislative history as a tool of statutory construction. *See, e.g.*, cases cited in *In the Matter of Sinclair*, 870 F.2d at 1342–43. This caution extends even to committee reports, which are generally conceded to be the most authoritative sources of information about a particular statute. *See, e.g., International Bhd. of Elec. Workers, Local Union No. 474, AFL–CIO v. NLRB*, 814 F.2d 697, 712–15 (D.C.Cir.1987); *id.* at 712 (while committee report may be used to interpret unclear statutory language, it "cannot serve as an *independent statutory source having the force of law*") (emphasis original); *id.* at 715–20 (Buckley, J., concurring) (discussing dangers of judicial reliance on statements included in committee report for political purposes); *FEC v. Rose*, 806 F.2d 1081, 1089–90 & n. 15 (D.C.Cir.1986) (decrying "spurious" staff-created legislative history

**80.** Of course, we intimate no view on the merits of OEA's claims respecting this or any other

cause.

and attempts to manipulate it in order to achieve results in court that Congress as a whole did not sanction); *Hirschey v. FERC,* 777 F.2d 1, 7–8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring).

Far less reliable, as sources of statutory meaning, are remarks made during floor debate—even "authoritative" explanations offered by a bill's sponsors. While a sponsor's statements may reveal *his* understanding and intentions, they hardly provide definitive insights into *Congress'* understanding of the meaning of a particular provision. Few of his fellow legislators will have been on hand to hear the gloss the sponsor may have placed on a particular provision. Thus members of Congress, in voting on a measure, must be presumed to have relied on the meaning of the words read in context on a printed page. Moreover, a statute's sponsor may well be pursuing a political agenda in his floor discussion that judges are ill-equipped to detect. *See International Bhd.,* 814 F.2d at 715–18 (Buckley, J., concurring).

■ In short, legislative history contains too many pitfalls to warrant consultation when there are no ambiguities to be resolved. Here, as our colleague himself acknowledges, the meaning of the statutory language, as it applies to this case, is absolutely clear. The Federal Service Labor–Management Relations Statute requires government employers to bargain over "conditions of employment," 5 U.S.C. § 7114, defined as "personnel policies, practices, and matters ... affecting working conditions." *Id.* § 7103(a)(14). Exempted from this duty to bargain are certain management rights, including, *inter alia,* the hiring, assignment, and direction of employees, *id.* § 7106(a)(2)(A), and the right to assign work, *id.* (B). Section 7106(b)(3), however, permits an agency and a union to negotiate over "appropriate arrangements for employees adversely affected by the exercise of any [management] authority."

In this case, DODDS's changes in work assignments clearly had an adverse impact on the teachers, who had the right to respond; and, equally clearly, the FLRA had the statutory duty to determine whether the arrangements proposed by the teachers' union were appropriate. Thus, we agree unreservedly with the careful analysis of the statutory text presented by Judge Robinson in Part III and his conclusion that section 7106(b)(3), "in plain English, authorizes negotiation of 'appropriate arrangements for employees adversely affected,' not by a firing, demotion or pay cut, but by 'the exercise of *any* authority under this section by such management officials.'" Judge Robinson's opinion at 965 (emphasis in original).

With all respect, as the English is plain, we find our colleague's further reference to legislative history and the inferences he draws from it to be inappropriate. We are particularly concerned by his reliance, in Section IV, on the floor remarks of even such careful legislators as Representatives Udall and Clay. These comments are used to support the conclusion that the management rights specified in (and expanded by) section 7106(a) were to be *"strictly* construed," their negotiability treated as "a *narrow* exception" to the duty to bargain, and *"any* doubt" resolved in favor of negotiation. *Id.* at 970–971 (emphases added). These qualifications could easily have been written into the statutory text had that been deemed necessary to achieve Congress' purpose, but they were not. This court has no authority to engraft restrictions onto the statute that its drafters did not choose to use, and that the members voting it into law never had the chance to consider.

We take exception to Section IV not only because we believe it ignores the Supreme Court's instruction that when "the terms of a statute [are] unambiguous, judicial inquiry is complete," *Burlington Northern,* 481 U.S. at 461, 107 S.Ct. at 1860, but also because the insertion, by judicial fiat, of adjectives and adverbs into straight-forward legislative language can prove mischievous over time. Judges trained in the common law tradition tend to look to the most recent opinion, rather than to its text, for guidance in determining a statute's meaning. In time, the chain of interpreta-

tion can supplant the plainest statutory meaning. In this case, our concern is that the limitations Judge Robinson reads into section 7106 might threaten the balance Congress has struck between federal employees' rights and management's prerogatives in pursuit of "an effective and efficient Government." 5 U.S.C. § 7101(b).

In sum, we conclude that the statutory provisions at issue unambiguously express Congress' intent to exempt specified management rights from an agency's duty to bargain, but to allow negotiations over "appropriate arrangements for employees adversely affected" by any exercise of such management authority. As the Act speaks for itself, reference to legislative history is unnecessary, and we cannot agree with our colleague's use of legislative materials to modify the plain meaning of the statute. Accordingly, we concur in all but Part IV of the opinion.