UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF THE CHIEF COUNSEL, INTERNAL REVENUE SERVICE, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent,

National Treasury Employees Union, Intervenor.

DEPARTMENT OF THE TREASURY, OFFICE OF CHIEF COUNSEL, INTERNAL REVENUE SERVICE, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent,

National Treasury Employees Union, Intervenor.

Nos. 91–1139, 91–1316.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1992.

Decided April 14, 1992.

Robert V. Zener, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., William Kanter and Howard S. Scher, Attys., Dept. of Justice, Washington, D.C., were on the brief, for petitioner in Nos. 91–1139 and 91–1316. Thomas M. Bondy, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for petitioner.

James F. Blandford, Atty., F.L.R.A., with whom William E. Persina, Sol., and William R. Tobey, Deputy Sol., Washington, D.C., were on the brief, for respondent in Nos. 91–1139 and 91–1316.

David F. Klein, with whom Gregory O'Duden, Washington, D.C., was on the brief, for intervenor in Nos. 91–1139 and 91–1316. Elaine D. Kaplan, Washington, D.C., also entered an appearance, for intervenor.

Before: WALD, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Department of the Treasury petitions for review of a determination by the Federal Labor Relations Authority (FLRA) that certain contractual clauses proposed by the National Treasury Employees Union in negotiations with the Internal Revenue Service (IRS) are negotiable under 5 U.S.C. § 7106(b)(3) because they constitute "appropriate arrangements for employees adversely affected by the exercise of [management rights]." We grant the Authority's cross-petition for enforcement with respect to one of the three clauses in dispute but grant the Treasury's petition and remand to the FLRA as to the other two.

## I.

The first of the proposals at issue[1] requires that personnel evaluations be provided to employees within 45 days of their development or receipt by a supervisor. Otherwise, the evaluations may not be used by the agency, and material that may adversely affect an employee's appraisal or rating must be destroyed.

Treasury takes the position that this proposal interferes with management's rights under subsection 7106(a) to "direct" employees and to "assign work," 5 U.S.C. § 7106(a)(2)(A), (B), because those rights necessarily include the ability to evaluate employee performance, and the proposal prohibits management from using evaluative information that is not shared with employees within the stipulated time frame. *See National Treasury Employees Union*, 39 F.L.R.A. 27, 55 (1991) (*NTEU*). In other words, it is not the requirement that the agency turn over to an employee his or her evaluation that putatively interferes with management's rights; it is rather the prohibition on the use of evaluative material not timely disclosed.

The Authority agreed, *see id.* at 56–57, but held that the proposal is nevertheless negotiable under subsection 7106(b), which provides that the prerogatives reserved to management under subsection 7106(a) are subject to three exceptions:

Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

5 U.S.C. § 7106(b).

The Authority first rejected the union's argument that the clause is a negotiable "procedure" under paragraph (b)(2). A proposal does not qualify as a "procedure" if it "directly interfere[s]" with the exercise of a reserved management right, *e.g.*, *United States Customs Serv., Washington, D.C. v. FLRA*, 854 F.2d 1414, 1418 (D.C.Cir.1988) (quoting *National Fed'n of Fed. Employees, Local 1745 v. FLRA*, 828 F.2d 834, 840 (D.C.Cir.1987)), as was determined to be the case here. We find the Authority's reasoning puzzling, because the *procedure* that the union wishes Trea-

---

**1.** The three proposals read as follows:

[Proposal 1]
*Article 21, Section 7(A)*
An evaluative recordation will be furnished to an employee within forty-five (45) days of its development or receipt by a supervisor. If not furnished to the employee within forty-five (45) days, it may not be used by the supervisor or by a ranking panel or official. Any material that may have an adverse effect on an employee's appraisal or rating by a ranking panel or official ... that is not shared with the employee[ ] will be removed and destroyed.

[Proposal 2]
*Article 24, Section 2(C)*
Supervisors will refrain from rotating or scheduling assignments of employees to avoid compensation of a particular employee at the higher level.

[Proposal 3]
*Article 13, Section 1(A)(B)(C) and (D)*
A. The [IRS] will approve leaves of absence of any employee elected to a position of na-

tional officer of the Union for the purpose to [sic] serving full-time in the elected position.
B. The [IRS] will approve a leave of absence for one elected local chapter officer for the purpose of serving full-time in the elected position.
C. Leaves of absence granted under A and B, above, will be for a period concurrent with the term of office of the elected official and will be automatically renewed by the [IRS] upon notification in writing from the elected official who has been reelected and wishes to continue in a leave of absence status.
D. The [IRS] will approve leaves of absence for two (2) employees, but not more than one employee from any one work unit, for the purpose of serving in full-time appointive positions for the Union. There [sic] term of the leave of absence will be two (2) years. All affected individuals may have their leaves of absence renewed for one additional two (2) year period upon request.

sury to accept—the obligation to share the evaluation contemporaneously with the employee—is not thought a burden, even by Treasury. It is only the *sanction* that the clause imposes if management violates the procedure—the prohibition on use of undisclosed evaluations—that allegedly impinges upon management prerogatives. But that sanction (or something much like it) would be implicit in an agreement to abide by the procedure and would likely be imposed by an arbitrator in the event of noncompliance. If the only procedures that qualify under paragraph (b)(2) are those that an agency can violate without fear of a sanction interfering with substantive management rights, then negotiable procedures would seem virtually unenforceable, and paragraph (b)(2) would then lack real content. Nevertheless, no party objects to the FLRA's determination that the exception for "procedures" does not apply to the first proposal, and so we do not decide the issue.

■ The FLRA, instead, accepted the union's alternative argument that the clause constitutes an "appropriate arrangement[ ] for employees adversely affected by the exercise of [management rights]" under paragraph (b)(3). It reasoned that employee evaluations are used to make personnel decisions and thus, if negative, will have adverse consequences. The proposal mitigates those consequences by enabling employees contemporaneously to explain or clarify unfavorable information. *See NTEU,* 39 F.L.R.A. at 57–58. The Authority, using its balancing test, *see National Ass'n of Gov't Employees, Local R14–87,* 21 F.L.R.A. 24, 31–33 (1986) (*Kansas Army Nat'l Guard*), said that the proposal is appropriate because it does not "excessively interfere[ ]" with management rights. *NTEU,* 39 F.L.R.A. at 58. The benefit employees receive from the opportunity to respond to evaluations (which management is in no way constrained from instituting), it is said, outweighs any inconvenience management suffers from being required to disclose them, and the agency as a whole benefits from personnel decisions based on accurate information. *See id.* at 58–59.

Treasury argues that the FLRA is misusing paragraph (b)(3) to permit the union to bargain over the exercise of management rights, the effects of which are not yet known. It points out that any given evaluation may be positive, not negative, in which case it can hardly have an adverse effect. To be sure, an adverse effect cannot be merely speculative. *See Patent Office Professional Ass'n v. FLRA,* 873 F.2d 1485, 1492 (D.C.Cir.1989) (citing *Kansas Army Nat'l Guard,* 21 F.L.R.A. at 31). But we see nothing in the language of paragraph (b)(3) that requires union proposals to target in advance the very individual employees who will be adversely affected. We think it sufficient that the Authority reasonably concluded that evaluations will surely have adverse effects on some employees.

Treasury also makes the related argument that the FLRA's application of paragraph (b)(3) runs into a temporal analytical difficulty. Paragraph (b)(3), Treasury maintains, assumes that the adverse effect of the management right being exercised will occur *before* a negotiated "arrangement" designed to ameliorate the impact of management's actions can come into play. That is, a union proposal is an "arrangement[ ] for employees adversely affected" only if it is intended to mitigate or minimize the adverse effects of a management right *after* that right has been freely exercised. Since the adverse effects of the evaluations would not normally be felt until some subsequent personnel decisions were made based on the evaluations, the "arrangement" sought in this case would actually precede the adverse effect. Treasury relies both on the language of paragraph (b)(3) and on one of our prior opinions, *American Federation of Government Employees AFL–CIO, Local 1968 v. FLRA,* 691 F.2d 565 (D.C.Cir.1982), *cert. denied,* 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 297 (1983) (*Local 1968*), where we suggested that paragraph (b)(3) "contemplate[s] a temporal distinction of sorts—an employee is affected only after management action, hardly before." *Id.* at 574, n. 86. It also points to use of the words "minimize" and "mitigate" in decisions of

the FLRA and this circuit. *See, e.g., Overseas Educ. Ass'n, Inc. v. FLRA*, 876 F.2d 960, 963, 964 n. 2 (D.C.Cir.1989); *NTEU*, 39 F.L.R.A. at 66. And it analogizes to the "direct interference" test we have approved for the identification of "procedures" under paragraph (b)(2).[2]

The Department compares this case with the proposal at issue in *American Federation of Government Employees, AFL-CIO, Local 2782 v. FLRA*, 702 F.2d 1183 (D.C.Cir.1983) (Scalia, J.) (*Local 2782*). That proposal granted promotion preferences to employees demoted through no fault of their own—for example, through necessary reductions in force. According to Treasury, it was negotiable only because it allowed management freely to exercise a reserved right (to demote employees) and merely compensated (through promotion preferences) for the adverse effects of management's actions after the fact. This case is different, Treasury insists, because the union's proposal addresses potential adverse effects by interfering prospectively with management rights.

Treasury's argument assumes the relevant management right is a personnel decision to be made some day based on the evaluation rather than the creation of the evaluation itself. All parties agree that the proposal places no burden on the employer's ability to make evaluations of employees (as might be so if the union sought to negotiate criteria to be used in the evaluation process). And the subsequent hypothetical personnel decision is interfered with because the agency cannot use an evaluation if the agency violates the admittedly negotiable requirement timely to provide an employee with his or her evaluation.

We rather doubt that, in these circumstances, the relevant management right should be thought to be the hypothetical future personnel decision rather than the evaluation. If it were the evaluation, the so-called temporal problem would disappear. But the FLRA, although fudging the

issue, seems to accept Treasury's position that it is appropriate to measure the burden on the future hypothetical personnel decision.

■ It may be that the paradigm contemplated by the drafters of paragraph (b)(3) was a proposal such as the one involved in *Local 2782*. The temporal distinction emphasized by Treasury, and suggested in *Local 1968*, does seem to fit the statutory language "arrangements for employees adversely affected," but we are not persuaded that the language in question admits of no other reasonable interpretation. As it is used in paragraph (b)(3), "adversely affected" is simply an adjectival phrase, not a verbial phrase indicating the past tense, and hence allows alternative temporal readings. The language, in short, is ambiguous, and, as we have so often noted, we must therefore defer to the FLRA's interpretation of its own authorizing statute so long as the interpretation is reasonable. *See, e.g., Department of Health and Human Servs., Indian Health Serv., Oklahoma City v. FLRA*, 885 F.2d 911, 915 (D.C.Cir.1989); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

The government's underlying notion seems to be that paragraph (b)(3), like (b)(2), does not encompass union proposals that impinge in any way on reserved management rights, and, unless the arrangement applies only after the full exercise of the right, some interference with the right is unavoidable. But we have already held that (b)(3) impinges on the exercise of management rights. In *Local 2782*, we distinguished (b)(2) from (b)(3), pointing out that (b)(3) contemplates some constraints on the exercise of management prerogatives. *See Local 2782*, 702 F.2d at 1186–88; *accord Local 32, American Fed'n of Gov't Employees v. FLRA*, 728 F.2d 1526, 1528 (D.C.Cir.1984). While a direct interference test is appropriate to distinguish procedural from substantive

---

**2.** The single FLRA decision Treasury cites in support of its construction, *American Federation of Government Employees, AFL-CIO, Local 1625,*

30 F.L.R.A. 1105 (1988), we think, was actually decided on the ground that the alleged adverse effect was overly speculative.

proposals under paragraph (b)(2), which marks out the boundaries of protected management rights, we said that the same test would drain paragraph (b)(3), which can only be read as an *exception* to management prerogatives, of all meaning. *See Local 2782*, 702 F.2d at 1186–87. Arrangements for adversely affected employees will inevitably come at some cost to the exercise of management prerogatives. The *Local 2782* proposal, for example, may have left the right to demote employees unimpaired, but the "mitigating" promotion preferences themselves prospectively infringed a different management right—the right to fill positions from "among properly ranked and certified candidates" or "any other appropriate source." 5 U.S.C. § 7106(a)(2)(C). *See Local 2782*, 702 F.2d at 1185.

Similarly, here, the union's proposal leaves unaffected the right of the employer to evaluate employees, and, even assuming the contractual sanction for refusing to share the evaluation in a timely fashion can be thought an interference with management's right to make a personnel decision, it is a burden the agency easily avoids—by simply complying with the concededly negotiable disclosure requirement. We therefore do not take seriously Treasury's alternative argument that the first proposal is "inappropriate" because it permits management to evaluate some employees based on complete information and others on incomplete information, thereby distorting the appraisal process. That again assumes that the 45-day requirement will be violated, and we see no reason why it would be. We therefore affirm the Authority's determination that the first proposal is a negotiable appropriate arrangement.

## II.

The second and third proposals are more problematic. As explained by the parties, the second is designed to restrict management's ability to assign employees to a higher-graded job temporarily, but for a period of time insufficient to qualify for higher pay. Under another provision of the collective bargaining agreement, employees detailed to a higher-level position for one pay period or longer must receive the higher compensation associated with that position; the proposal, then, would prevent Treasury from rotating employees to a higher-graded job for less than one pay period for the specific purpose of eliminating the extra pay. *See NTEU*, 39 F.L.R.A. at 65. The FLRA saw the adverse effect on employees to be the purposeful assignment for less than the amount of time that, under the contract, would require additional compensation. *See id.* at 66.

█ Treasury argues persuasively that the Authority's reasoning is circular. Neither the union nor the Authority contends that a temporary assignment to a higher-level position itself has an adverse effect on employees. Such an assignment would seem to provide employees with an opportunity to gain valuable new skills. The adverse effect that the FLRA identifies is evidently nothing more than the denial of a benefit—a greater likelihood that the temporary assignment will last at least one pay period and thus will carry more pay—that the existing contract does not provide and that the union wishes to obtain. We agree with the government that the proposal does not appear to satisfy the Authority's own interpretation of paragraph (b)(3), under which a union proposal that simply seeks benefits for employees is insufficient—the proposal must address adverse effects flowing from the exercise of a protected management right. *See id.* at 38–39 (citing, *inter alia, Kansas Army Nat'l Guard*, 21 F.L.R.A. at 31). The FLRA appears to have accepted a bootstrap argument whereby the union proposes a benefit (higher pay for certain details lasting less than one pay period) and employees experience an adverse effect (lower pay) when management denies that benefit.

█ The third proposal, which would oblige the IRS to grant leaves of absence for employees elected or appointed to union offices, presents similar difficulties. It obviously interferes with management's ability to assign work; an employee on leave is not available for assignment. The Authori-

ty, however, held that this proposal also falls within paragraph (b)(3), because if the leaves of absence were *denied*, the workers who requested them and other bargaining-unit employees would be adversely affected: a denial would frustrate the statutory right of the denied employee to "assist a[ ] labor organization," 5 U.S.C. § 7102, and it would deprive other bargaining-unit members of representation. *See NTEU*, 39 F.L.R.A. at 47–48. Again, we think the Authority's reasoning is circular. The employee's dilemma is caused by his or her election or appointment to the union. The union has proposed a benefit (leaves of absence for its officials), and the denial of that benefit purportedly produces the requisite adverse effects. Under that sort of rationale, there is virtually no demand that cannot be made to fit into the adverse effect exception. Once management refuses the demand, presto: we have the adverse effect.

Treasury also argues that both the second and third proposals interfere "excessively" with management rights. The Department complains that the second proposal prevents management from employing short-duration details when they are most necessary—that is, when the agency must save money. But the Authority reasoned that the agency is not precluded from exercising its right to use short-duration details, because such details can still be used for any non-economic reason (for example, the Authority's brief suggests, when an employee's services are needed elsewhere in the organization). We afford considerable deference to the FLRA's balancing of management and employee interests under its "excessive interference" test, *see, e.g., Patent Office*, 873 F.2d at 1487, 1491, and we see no principled ground for not accepting its determination here.

It is not clear to us, however, why the third proposal's infringement on management's right to assign work is not "excessive." *See NTEU*, 39 F.L.R.A. at 48–49. It all depends on how one defines the right. The Authority has recently held that "the right to assign work ... includes the right to determine the particular duties to be assigned, when work assignments will occur, and to whom or what position the duties will be assigned." *American Fed'n of Gov't Employees Local 1808*, 42 F.L.R.A. 542, 553 (1991). If this means only that management retains discretion to institute work schedules for the organization as a whole, then the proposal's impact may well be trivial; it seems unlikely that many employees will be elected national officers of the union, and the proposal specifically limits the number of leaves granted to elected local chapter officers and appointed officials to one and two, respectively. But *if the right to assign work implies the right to assign the duties of each individual worker*, then the encroachment on management's prerogative could not be more severe: with regard to those employees whose leave requests satisfy the proposal's conditions, the agency's discretion is eliminated entirely. The FLRA has directed us to no authority for, nor has it given adequate explanation of, its conclusion that the right to assign work is not excessively interfered with here. It is not that we object to the FLRA's balancing, it is that we cannot determine how it defines the management right in the equation.[3]

\* \* \* \* \* \*

It seems rather obvious that the FLRA is seeking to stretch the adverse effects exception to the statutory reservation of management rights, but it simply cannot be that any benefit that the union seeks—and that implicates management rights—can be

---

**3.** The FLRA's other justifications for the third proposal's negotiability are insubstantial. We do not think the invocation of employees' section 7102 rights is at all relevant; under the Authority's own test, it is apparently not the presence of an employee right but the exercise of a *management* right that must create the adverse effect. We also think section 7131(d), which entitles unions to bargain for official (paid) time, *see* 5 U.S.C. § 7131(d), adds nothing

to the case. The Authority reasoned that in light of section 7131 it would be absurd to hold nonnegotiable a proposal for unpaid leave. *See NTEU*, 39 F.L.R.A. at 49. That seems to us to be a *non sequitur*. But, in any event, section 7131 provides for paid time only for employees engaging in union representative functions, whereas the third proposal appears to cover employees engaged in internal union business, as well.

extracted from those rights simply by the linguistic trick of describing management's refusal to accept the union's demand as having created an adverse effect. We do not think the Authority has explained why the second and third proposals, rather than merely seeking benefits for employees, compensate for adverse effects that flow from the exercise of management prerogatives. Nor is the scope of management's right to assign work sufficiently clear. Accordingly, we affirm the Authority's negotiability determination and grant its cross-petition for enforcement with respect to the first clause but vacate its conclusions with respect to the second and third clauses and remand for further proceedings.

*So ordered.*